Smith *v.* State.

No. 41304 November 2, 1959 115 So. 2d 318

*Philip E. Stevens,* Laurel, for appellant.

500

*G. Garland Lyell, Jr.,* Asst. Atty. Gen., Jackson, for appellee.

KYLE, J.

The appellant, Charles Smith, was indicted by the grand jury at the October 1958 term of the Circuit Court of the Second Judicial District of Jones County, along with Lucas McCurty, Y. J. Jones and Willie Eugene Smith, alias "James Willie Smith, Jr.," on a charge of armed robbery. The indictment specifically charged that the above named defendants "did, then and there, each acting in conjunction with the other said defendants, wilfully, unlawfully and feloniously make an assault upon the person of Robert Evans with a certain deadly weapon, towit, a 32 caliber automatic pistol", and then and there by violence to the person of the said Robert Evans and by putting him in fear of immediate injury, "did then and there wilfully, unlawfully and feloniously rob, take and steal and carry away" two five-dollar bills and eighteen one-dollar bills, of the total value of $28 in good and lawful money of the United States of America, "said money being the property of the said Robert Evans," etc. The appellant was tried separately and was convicted and sentenced to imprisonment in the state penitentiary for a term of 12 years; and from that judgment he prosecutes this appeal.

The State's evidence shows that the alleged crime was committed in the driveway or on the parking lot in front of a cafe or restaurant, known as "Cleve's Place" or "Hehaw's Place," in the City of Laurel, sometime around 12:00 o'clock on Saturday night, October 4, 1958, or Sunday morning, October 5, 1958.

Robert Evans, the chief witness for the State, testified that he had driven from his home in Waynesboro to Lau-

rel during the early part of the evening to attend the South Mississippi State Fair. He was accompanied on this trip by Alec Evans and his wife, Louise Evans, who also lived at Waynesboro. Robert and his companions arrived at the fair grounds about 8:30 o'clock, and left the fair grounds sometime before 10:00 o'clock; and after visiting two or three other night spots, they arrived at Hehaw's Place about 12:00 o'clock. Robert bought some sandwiches for his guests, and while he was seated at a table in the cafe Y. J. Jones and Lucas McCurty, who is referred to in the record as "Pig" McCurty, entered the cafe. Y. J. walked over to Robert's table and sat down beside him, and ran his hand in Robert's pocket. A scuffle ensued immediately. The appellant, Charles Smith, who was in the cafe at that time, came over to the table and told Y. J. to "Break it up." Robert left the cafe almost immediately, and as he was about to get in his own car, which was parked in front of the cafe, the appellant approached him and invited him to go with him to the "Crown Club", another night spot located on the north side of U. S. Highway No. 11. Robert told the appellant that he would go with him if Alec Evans and his wife would go with them. Robert and Alec Evans and Alec's wife then got out of Robert's car and got in the appellant's car. Y. J. and Pig McCurty also came forward and got in the car. Robert then said to the appellant, "If you got company we won't go, we will just nol pros the trip." Robert and his two companions then got out of the appellant's car and got back in Robert's car. Before Robert closed the door of his car Y. J. Jones came to the door and "grabbed" Robert by the arm and said to him, "Charles wants to talk to you." Y. J. then "jerked" Robert out of the car and held him by the arm as they walked over to the appellant's car which was close by. The appellant was seated in his car at that time, and Robert asked the appellant if he had called for him. The appellant said "No." Y. J. then applied a vile epithet

to Robert, and said, "He didn't call you, we just want your money." Y. J. grabbed Robert and the two went into a tussle. Pig McCurty, who was standing by, then hit Robert with a scantling. Robert fell to the ground, and either Y. J. or Pig got straddle of him and went through his pockets. The other one threw a gun on him and told him to lay still and let him get what money he had.

Robert testified that the appellant was in his car when he fell to the ground; that Willie Langford walked up about that time, and Willie asked Robert, "What's going on?" Robert said to him, "These boys are robbing me." The appellant then jumped out of his car and told Willie not to have anything to do with the scuffle. The appellant said, "Mister, don't you have nothing to do with it." Willie started to run, and the appellant reached to catch him. Willie then got his knife and turned around and cut at the appellant. The appellant said, "This s.o.b., he done cut me." Pig McCurty, who had a pistol in his hand, then threw the gun on Willie and the gun snapped. Robert testified that Y. J. got the money out of his pocket, which amounted to about $28. The appellant, Y. J. and Pig then left the scene of the robbery in the appellant's automobile. Robert went into the cafe and requested that someone "call the law."

Robert's testimony was corroborated in the main by the testimony of Alec Evans and his wife, Louise Evans, and the testimony of Willie Langford, all of whom testified for the State.

Charles Horn, who also testified as a witness for the State, testified that he operated the "Barbecue Inn," which was located outside the city limits of the City of Laurel; that the appellant, Charles Smith, Pig McCurty, James Wright and another boy, whom he knew only as Annie Day Smith's boy, came to his place of business sometime between one and two o'clock during the early morning of October 5; and that he heard the boys arguing

about money in the front part of his Inn. Charles, Pig and James were arguing. Horn was asked what they were arguing about. His answer was: "All I know, they mentioned money. * * * Charles had the pistol on Pig and was speaking about his money, and James, seems like he was trying to stop it after he taken the pistol." Horn did not know what money they were talking about. Horn stated that James Wright took the pistol from Charles, and Pig and Charles then tried to take the pistol from James. James Wright finally gave the pistol to Melton Gavin and Melton gave it to Horn. Horn examined the pistol and found that it had a magazine and one cartridge in it. He then carried the pistol to his room and locked it up, and kept it there until the next morning when he turned it over to George Ellzey, the deputy sheriff.

The appellant, Charles Smith, testified that he did not invite Y. J. Jones and Pig McCurty to get in his car in front of Hehaw's Place on the night of the alleged robbery, when he and Robert Evans and Robert's two companions were about to leave the cafe and drive to the "Crown Club." He testified that he had broken up the fight between Robert Evans and Y. J. Jones on the inside of the cafe, and when they got into the tussle outside of the cafe, he decided that he would let them fight it out, and when he saw Willie Langford walk up with the knife he told Willie to stay out of it. He stated that he later undertook to pull Y. J. off of Robert Evans, and Willie Langford cut him with a knife. He then chased Willie away with a pistol which he had taken from Y. J. He stated that he did not participate in the tussle that took place between Y. J. and Robert outside of Hehaw's cafe any more than that he tried to pull Y. J. off of Robert. He did not know what Y. J. and Robert started to fighting about, and he did not see Y. J. run his hands in Robert's pockets. He stated that Pig McCurty did not get into the fight and did not hit Robert Evans on the head with a scantling. Pig had the pistol in his bosom,

and he had seen Pig with the pistol down at Charlie Horn's place. The appellant stated that the reason that he wanted to go to the Crown Club was that they had dancing over there and they had an orchestra.

The appellant's attorney has assigned and argued four points as grounds for reversal of the judgment of the lower court:

(1) That the trial court erred in admitting as evidence in the case the testimony of Charlie Horn relating to a controversy which took place between the appellant and one or more of his co-indictees at Charlie Horn's Barbecue Inn, a short time after the alleged robbery.

(2) That the trial court erred in refusing to instruct the jury to find the appellant not guilty of the charge of armed robbery at the conclusion of the State's evidence.

(3) That the trial court erred in giving the State an instruction, which appears on page 12 of the record, to the effect that, if the jury believed from the evidence that the appellant aided and abetted in the commission of the robbery, as an accessory before the fact, he should be convicted as a principal.

(4) That the trial court erred in imposing a sentence of imprisonment in the state penitentiary for a term of 12 years upon the appellant as punishment for the crime.

We think the court erred in admitting as evidence in the case of the testimony of Charlie Horn relating to an argument over money which took place between the appellant and one or more of his co-indictees at Horn's Barbecue Inn a short time after the alleged robbery. What took place at Horn's Barbecue Inn sometime after the alleged robbery constituted no part of the res gestae; and Horn testified that he did not know what money they were talking about. So far as the record shows, Horn saw no money of any kind in the possession of any of the boys, and no statement was made by any of the boys which indicated that the money which they

were arguing about, was money which had been taken from Robert Evans, or money which represented the fruits of the crime with which the appellant was charged. The fact that the boys were arguing about money, it may be readily admitted, was a suspicious circumstance, which, in the light of the evidence relating to the robbery, might lead one to suspect that the boys were arguing about money taken from Robert Evans during the scuffle at Hehaw's Place. █ But Horn's testimony, in our opinion, was not sufficiently definite to be of evidential value in the trial of the issue which the jury had to decide. That the admission of the testimony was extremely prejudicial to the appellant cannot be doubted; and in the absence of more specific proof that the money referred to was money which they had obtained from Robert Evans, we think the court erred in overruling the appellant's objection to the admission of the testimony.

 █ We think there was no error in the action of the trial judge in refusing to instruct the jury, at the conclusion of the State's evidence, to find the appellant not guilty of the charge of armed robbery. The testimony of the State's witnesses, in our opinion, was sufficient to present an issue of fact as to the appellant's guilt for the jury to decide.

Section 1995, Mississippi Code of 1942, Rec., provides that: "Every person who shall be an accessory to any felony, before the fact, shall be deemed and considered a principal, and shall be indicted and punished as such; and this whether the principal have been previously convicted or not."

In the case of Wynn v. State, 63 Miss. 260, the Court said: "Aiding and abetting is defined to be 'the offense committed by those persons who, although not the direct perpetrators of a crime, are yet present at its commission, doing some act to render aid to the actual perpetrator.' Bouvier's Law Dictionary. And such aiding and

abetting may be manifested by acts, words, signs, motions, or any conduct which unmistakably evinces a design to encourage, incite or approve of, the crime, or even by being present, with the intention of giving assistance, if necessary, though such assistance may not be called into requisition.'' In the later case of Crawford v. State, 133 Miss. 147, 97 So. 534, the Court qualified the statement made in the Wynn case, supra, by saying that ''Mere presence, even with the intention of assisting in the commission of a crime cannot be said to have incited, encouraged, or aided the perpetrator thereof unless the intention to assist was in some way communicated to him.'' But, in the case that we have here, the State's evidence connecting the appellant with the crime went much further than merely showing that Smith was present at the scene of the crime under circumstances which might indicate an intention on his part to assist Y. J. Jones and Pig McCurty in the commission of the crime. Several of the State's witnesses testified that when Willie Langford walked up and asked Robert what was going on, the appellant jumped out of his car and told Willie not to have anything to do with the scuffle. The appellant said, ''Mister, don't you have nothing to do with it.'' The State's witnesses also testified that immediately after the alleged robbery had been committed the appellant and Y. J. and Pig left the scene of the robbery together in the appellant's automobile. The testimony of these witnesses, if believed, was sufficient in our opinion to support a finding that the crime charged in the indictment had been committed by the appellant's co-indictees, and that the appellant had aided and abetted Y. J. Jones and Pig McCurty in the commission of the crime.

■■■ We think the court erred, however, in granting the State's instruction which appears on page 12 of the record. That instruction reads as follows:

''The Court here instructs the jury for the State that every person who is an accessory to a felony, be-

fore the fact, is deemed and considered a principal and shall be indicted and punished as such and if you believe from the evidence in this case beyond a reasonable doubt that the Defendant, Charles Smith, was present, aiding, assisting and abetting Lucas McCurty, Y. J. Jones, and Willie Eugene alias James Willie Smith, Jr., or either of them, when they did wilfully, unlawfully and feloniously point and aim a fire arm and deadly weapon, to-wit: a 32 caliber pistol at and upon Robert Evans, and did put the said Robert Evans in fear of great bodily harm and did wilfully, unlawfully, feloniously and violently take from the person of said Robert Evans his personal property being good and lawful money of the United States of America and did wilfully, unlawfully, feloniously and violently rob, take, steal and carry away said money, (If you found all the foregoing allegations to be proved from the evidence beyond a reasonable doubt), then under your oath it is your sworn duty to find the Defendant, Charles Smith, guilty as charged."

The instruction, in our opinion, is erroneous, in that it is couched in such language that the jury may have reasonably assumed that, in the mind of the trial judge at least, the fact that the crime of armed robbery had been committed by the appellant's co-indictees had been conclusively established, and that the only question which the jury had to decide was, whether the defendant, Charles Smith, "was present, aiding, assisting and abetting" his co-indictees in the commission of the crime.

That every person who is an accessory to a felony, before the fact, shall be deemed and considered a principal, and shall be indicted and punished as such, is a correct statement of the law. But, as stated by the text writer in Wharton's Criminal Law and Procedure, "By definition a person can only be guilty of aiding and abetting the commission of an act which is a crime. If the primary act is in fact not criminal, the 'aider and

abettor' is not guilty of an offense. This requires the prosecution to prove not merely the fact of aiding and abetting but also of aiding and abetting the commission of a crime which was in fact committed.'' Wharton's Criminal Law and Procedure, by Ronald A. Anderson (1957), Vol. 1, p. 249, Parties, par. 114.

In order to convict the appellant in this case it was necessary for the State to prove by evidence sufficiently clear and convincing to satisfy the jury beyond every reasonably doubt, first, that the crime charged had actually been committed and, second, that the appellant had aided and abetted in its commission. State v. Barry (1953), 43 Wash. 2d 807, 264 P. 2d 233. The instruction complained of did not embody a clear statement of the measure of proof which the law exacts in such cases. The instruction, as drawn, permitted the jury to assume as a fact already established that the crime of robbery had been committed by the appellant's co-indictees; and the court erred in granting the instruction.

In view of the conclusions that we have reached on the points discussed above, it is not necessary that we consider the remaining point mentioned in the appellant's assignment of errors. For the reasons stated above the judgment of the lower court is reversed and the cause remanded.

Reversed and remanded.

*Roberds, P. J.,* and *Hall, Lee* and *Holmes, JJ.,* concur.