330 So.2d 580 (1976)
John RAY
v.
STATE of Mississippi.
No. 48840.
Supreme Court of Mississippi.
April 20, 1976.
*581 Beach, Beach, Luckett & Hanbury, Jackson, for appellant.
A.F. Summer, Atty. Gen., by Karen A. Gilfoy, Asst. Atty. Gen., Pete J. Cajoleas and John C. Underwood, Jr., Sp. Asst. Attys. Gen., Jackson, for appellee.
Before INZER, P.J., and SUGG and WALKER, JJ.
INZER, Presiding Justice, for the Court:
John Ray, appellant, was indicated in the Circuit Court of Pike County for the crime of discharging a firearm into a dwelling house. Pursuant to his motion for a change of venue trial was had in the Circuit Court of Lawrence County. Defendant was convicted and sentenced to serve a term of ten years in the State Penitentiary. From this conviction and sentence he appeals. We reverse and remand.
There were no eye witnesses to establish a connection between appellant and the crime charged, and the state's case was based entirely upon circumstantial evidence. The principal facts reflected by the record are as follows:
At about 10 A.M. on November 1, 1973, Mrs. Katherine Roach, wife of Judge J. Gordon Roach, upon entering the sun parlor at the front of their home, located at 310 Kentucky Avenue in the City of McComb, discovered holes in the front windows and in the wall opposite these windows. Upon investigation by the police, the holes were determined to have been made by a .00 buckshot. The pellets had penetrated both the window glass and surrounding wooden frames and had crossed the room and pierced the wall opposite the window.
On the previous day, which was Halloween, Mrs. Roach spent the entire day at home. During that day she cleaned the sun parlor and everything was in order. Nothing unusual occurred until that night. Judge Roach returned home from a meeting about 10:15 P.M. As he approached his home driving east on Kentucky Avenue, he observed nothing unusual. He turned left into his driveway and parked his car in the rear of his house and entered his home by the kitchen door. He and Mrs. Roach were in the den watching television with all the lights in the house off, except in one bathroom, that was not visible from the street. About ten minutes after Judge Roach arrived home, he heard a car traveling west on Kentucky Avenue making a loud noise because of some defect in the muffler. At about the same time, he heard three or four loud explosions that he said could not have been fire-crackers *582 but were shotgun shots. He telephoned the police and informed them that someone was shooting in the area. Nothing else of an unusual nature occurred that night. The next morning Mrs. Roach discovered that her home had been shot into.
Mr. and Mrs. Lamar Rushing live next door to the Roach's home and although their home is not directly on the corner, it is in close proximity to the intersection of Kentucky Avenue and Broadway Street and the intersection is clearly visible from their home. On the night of October 31, 1973, the Rushings were at home watching television when they heard a car with a loud muffler stop in front of their house. Mr. Rushing went to the front door to see if he could get the tag number of the car because some drag racing had been occurring on that street. Mr. Rushing testified that the first time he saw the car at about 10:10 P.M. it turned off Broadway and was traveling west on Kentucky Avenue. The next time the Rushings heard the car it was traveling east on Kentucky Avenue and turned south on Broadway. Both Mr. and Mrs. Rushing said that the car was traveling very slowly and that they were able to get a clear view of it. Both described the car as being a Pontiac Grand Prix with brown bottom and white top. It had a fine white stripe down the side with one hubcap on the left and no hubcaps on the right side. They noticed dents in the rear of the trunk and on the left front door. Neither were able to get the tag number. The next time they heard the car it was traveling west on Kentucky Avenue. Mr. Rushing said he heard it coming, and by the time he got to the door the car stopped in front of his house. When he opened his door, the car took off, as he stepped on the porch he heard three or four shots. He said as far as he could tell the shots were coming from the car. Mr. Rushing stated that he observed what he thought were two occupants in the front seat of the car, but he could not identify these occupants, either as individuals or generally as to color, sex, or dress. Mrs. Rushing also heard the car and the shots, but did not see the car on its third trip. She said she saw the same car pass in front of her home about 2 A.M. on that night. Both Mr. and Mrs. Rushing identified photographs of the automobile allegedly driven by appellant on this night as being the car they saw passing in front of their home when the shots were fired.
Police Officer Billy Knight was on duty on the night in question and at 10:30 he heard a radio communication regarding shooting going on near the Roach home. When he heard the communication he was about one block from the Roach home driving west on Georgia Street. He did not respond to the call but continued west on Georgia Street. As he approached the intersection of Georgia and Caston Streets, about four blocks from the Roach home, he saw a white over brown Pontiac Grand Prix stop at a stop sign at the intersection and then proceed south on Caston at about 20 to 25 miles per hour. As this car passed in front of him, he saw the driver and recognized him as being the appellant, John Ray. Another person was in the front seat, but he could only identify this person as being white. He could not tell whether the person was male or female. He testified that he noticed that the car was running rough and the muffler was hanging down. Later that same night he saw the car parked in front of appellant's home.
The following day after learning of the shooting the police found four green .12 gauge .00 shotgun shell hulls on Kentucky Avenue near the north curb in front of the Roach home. The distance between the easternmost point and the westernmost point where the shells were found was about 21 steps.
Further investigation revealed that on October 24, 1973, Gentry Dowland, a game warden, had received notice that someone was shooting east of Fernwood. He went to investigate and about two miles east of Fernwood he saw a 1971 Pontiac, white *583 over brown, or chocolate car, parked on the roadside. At the time he saw the automobile, he heard shots from a .22 caliber rifle and a single shotgun shot off to the southwest. Investigating, he came upon a person named Freddie Andrews carrying a .22 rifle and a dead squirrel. Andrews did not have a hunting license and Dowland gave him a ticket requiring him to answer the charge of hunting without a license. Although Andrews told Dowland that he had been hunting alone, Dowland observed that the squirrel had been shot by a shotgun instead of a rifle. Investigating further, Dowland came upon the appellant to the southeast of where the car was parked. Appellant was carrying a shotgun but had no game. When appellant was asked for his hunting license he stated that he did not need a license because he was not hunting but was just shooting snakes. After some words, Dowland placed appellant under arrest for hunting without a license and seized from him a .12 gauge shotgun and one unfired .12 gauge shotgun shell loaded with.06 shot, which Dowland ejected from the gun. At the jail, Dowland seized seven additional unfired blue .12 gauge shotgun shells loaded with No. 6 shot, which appellant had in his jacket. Later that day after bail was posted for appellant by his sister, the gun was returned to him, but the shells were retained by the game warden. Both the justice of the peace and the game warden identified the gun as being a .12 gauge pump gun.
On November 1, 1973, during an investigation of the shooting into the Roach home, Dowland and several other officers returned to the woods where appellant had been arrested and in that general area they found a blue .12 gauge Remington Peters shotgun shell hull that had printing on it showing it had been loaded with No. 6 shot.
The investigating authorities delivered to the Mississippi Crime Laboratory the four green Remington Peters .00 shotgun hulls found in front of the Roach home which became laboratory exhibits No. 1, 2, 3 and 4. The blue .12 gauge Remington Peters hull found in the woods near where appellant was arrested became laboratory exhibit No. 5, and the seven unfired .12 gauge Remington Peters shotgun shells seized by the game warden at the jail became laboratory exhibits R, S, T, U, V, W and X.
John Dial, a criminologist employed by the Mississippi State Crime Laboratory, who qualified as an expert, testified that exhibits 2 and 3, being two of the hulls found in front of the Roach home and exhibit No. 5, being the hull found in the woods, had been fired by the same gun. The other two hulls found in front of the Roach home had been mutilated so that he could not tell whether they had been fired by the same gun as fired by exhibit No. 5. Dial also testified that exhibits S, T, and X, being three of the unfired shells taken from appellant at the jail, had been chambered in the same gun as laboratory exhibit No. 5, being the hull found in the woods. On cross examination Dial stated that he could not tell whether they had been fired by an automatic or a pump gun, but in all probability they had been fired by a pump gun due to the fact of the markings on the hulls.
Over the objection of appellant, the state was allowed to introduce into evidence the certified copy of a sentencing order showing the conviction of appellant's brother, Michael Terry Ray, entered on the minutes of the Circuit Court of Pike County on October 15, 1973, pursuant to his conviction for the possession of marijuana with the intent to distribute for which he was sentenced to serve a term of six years in the State Penitentiary.
Mrs. Grace Myerhoff was called as a witness by the defendant, and she testified that she lived across the street from the Roach home. On the night of October 31, 1973, she heard a car with a loud exhaust pass her home two or three times. She went to the front window and looked out. She did not see an automobile, but did see *584 a pedestrian of medium height and build walking west on the sidewalk of Kentucky Avenue, being at that time about her driveway and across the street from the Roach home. The pedestrian was wearing a three-quarter length coat and a floppy hat. She could not tell whether the person was male, female, white or black. She did not observe anything being carried by the pedestrian. Within a matter of seconds after observing this pedestrian, she heard an automobile with a loud exhaust go west on Kentucky Avenue and the sound of three or four explosion-type noises.
Appellant did not testify in his own behalf, but introduced testimony tending to show that he did not own a .12 gauge shotgun, and that the gun he had in his possession on October 24, 1973, when arrested by the game warden, was owned by his brother-in-law Bill Scott, and that he had borrowed this gun from his sister, the wife of Bill Scott, on the morning of October 24, 1973. This gun was returned to Mrs. Scott after she posted bail for appellant after his arrest. This gun, along with another .12 gauge pump gun, was taken to the crime laboratory on July 30, 1974, and the expert, John Dial, fired three shells from each gun and compared these against the green .12 gauge buckshot hulls found in front of the Roach home, and the blue .12 gauge shotgun shell hull found in the woods. By this examination he found that none of these hulls had been fired from either gun owned by Bill Scott.
In addition, appellant introduced a witness who testified on the night of October 31, 1973, appellant was at a nightspot called "The Game Reserve," at the time the shots were alleged to have been fired on Kentucky Avenue. A witness also testified that on the night in question the white over brown automobile owned by appellant's wife was being used by Freddie Andrews, who had driven it to the home of a witness, Janice Wegrzyn, where it remained from 10:15 P.M. until a little after 11 P.M.
On appeal, appellant argues several points for reversal of his conviction, but we will only discuss those points that we deem merit discussion.
Appellant filed a motion to suppress the shotgun shells seized and taken from him by the game warden as the fruits of an unlawful arrest, and to suppress all testimony in relation thereto. A hearing was had on the motion and it was overruled. On the trial of the case on the merits, appellant renewed his motion and it was again overruled. This action by the trial court is assigned as error. Appellant argues that the game warden had no warrant for his arrest and that he was not committing a misdemeanor in the presence of the officer. The validity of the arrest hinges upon the question of whether appellant was committing a misdemeanor in the presence of the game warden. Appellant argues that although he was in the woods carrying a shotgun where the game warden heard a shotgun fire, he had no game and was only hunting snakes. Therefore, he was not committing a misdemeanor in the presence of the officer. We find no merit in this contention. Section 49-7-49, Mississippi Code 1972 Annotated, provides as follows:
Prima facie evidence of hunting, trapping or fishing.
For the purpose of this chapter, the fact that any person shall be found in the possession of a trap, fishing tackle, or other device of any description whatsoever used for the purpose of taking wild animals, wild birds or fish in the natural habitat of such animals, birds or fish, or in the possession of dead bodies of wild birds, wild animals or fish within the field, in the forests or on the public highways or on the waters of this state, shall be prima facie evidence that such person is or has been hunting, trapping or fishing.
In the light of this statute and the facts of this case, we are of the opinion that appellant was committing the misdemeanor *585 of hunting without a license in the presence of the game warden, and that his arrest was lawful. See Musgrove v. State, 236 Miss. 513, 110 So.2d 919 (1959).
Appellant urges that the trial court was in error in refusing to grant his requested peremptory instruction at the conclusion of the evidence. Appellant argues that the evidence was entirely circumstantial and not sufficient to establish his guilt beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis. After a careful review of the evidence, we are of the opinion that the evidence was sufficient to make a jury issue of the appellant's guilt.
Appellant assigns as error the overruling of his objection to the introduction in evidence of a certified copy of the order of the circuit court showing the conviction and sentencing of his brother Michael Terry Ray on a narcotics charge. The certified copy of the order shows that appellant's brother was convicted in the Circuit Court of Pike County of the crime of the possession of marijuana with the intent to deliver, and was on October 15, 1973, sentenced to serve a term of six years in the State Penitentiary. There is a general rule that evidence of another crime committed by another person shall not be presented against an accused in a criminal trial. Hosey v. State, 300 So.2d 453 (Miss. 1974). However, the state argues that this evidence was admissible to show a motive for the accused to commit the crime for which he is charged. The difficulty with this argument is that a complete absence of any evidence exists to show that the accused knew of the conviction and sentence of his brother, or that he ever expressed any ill will against the judge as a result of such sentence. Absent such a showing the evidence was irrelevant and immaterial, and its admission constituted error. Gillum v. State, 62 Miss. 547 (1885); Humphreys v. State, 122 Miss. 41, 84 So. 141 (1920).
The state contends that even if it were error to admit this testimony, it was harmless error. With this we cannot agree. The guilt of the accused depended entirely upon circumstantial evidence and was a close question on the facts. As in Humphreys, supra, wherein this Court stated:
While the testimony, if believed is sufficient to support a verdict of guilty, the record nevertheless presents a close case on the facts. It is therefore not only of great concern to the accused in this case but of great importance to an absolutely fair administration of justice, that no error should be committed by the trial court in the exclusion or admission of testimony, or in stating the applicable law of the case to the jury.
(122 Miss. at 44, 45, 84 So. at 142).
We are of the opinion that the admission of the evidence relative to the conviction of the brother of the accused on a narcotics charge was highly prejudicial and constituted reversible error.
Appellant also assigns as error the refusal of the trial court to allow his counsel additional time for summation and argument to the jury. The record reflects that the trial court limited the time for argument of counsel to thirty minutes for each side. Counsel for appellant requested additional time and the court refused to grant the same. Relying on Wingo v. State, 62 Miss. 311 (1884), appellant contends that restricting his counsel to thirty minutes to argue this case based entirely on circumstantial evidence deprived him of a fair trial. In Wingo, the evidence was, as here, circumstantial and conflicting. Twelve witnesses were examined, seven for the state and five for the appellant. The court limited the time for argument to one hour to each side, and counsel for the appellant objected to that limitation. On appeal, this Court reversed the judgment of the trial court because the time allotted the appellant to make his defense before the jury was insufficient. In doing so, the *586 court pointed out that by virtue of the Constitution the accused has the right to be heard by himself or counsel or other, and that this right is of inestimable value, not only to the accused but to the administration of public justice. The Court stated:
The right to be heard exists, and it cannot be denied, but intolerable evils might result and the very purposes for which courts of justice were instituted might be defeated if no limitation could be imposed on the freedom of speech in this behalf. Judicial authority may be, and should be, asserted to prevent abuse in this respect, but to limit the argument of counsel for the defense in a criminal prosecution is a matter of great delicacy, and should be done with the utmost prudence and caution. It would always be safer in such case to err on the side of liberality than to take the hazard of doing injustice. Limitations on the argument of counsel which might be comparatively harmless and be approved in the trial of civil causes and minor offenses, might be extremely dangerous and be condemned in the trial of grave criminal charges. When the time for the argument of counsel to the jury is restricted by the court, it should be very clear that the right of the accused to be heard has not been essentially impaired, and that an opportunity for making full and complete defense on the whole case has not been denied. What time would be necessary or reasonable for this purpose would depend, to a great extent, upon the character and circumstances of the particular case.
(62 Miss. at 315).
In Turner v. State, 220 So.2d 295 (Miss. 1969), in discussing this subject we stated:
A trial judge should be meticulously careful in seeing that the defendant is afforded ample time in any case in order that he may adequately present to the jury the instructions and have sufficient time for his summation. The ultimate of a criminal prosecution is the verdict of the jury and frequently the decision of the jury is made substantially on the presentation of the law and the summation of the facts. It is a far better thing for the trial court to be indulgent in the granting of time for presenting the instructions in summation than to be strict or to be frugal in the allowance thereof. (220 So.2d at 298). (Emphasis added).
While we are fully aware of the crowded dockets in the trial court and of the necessity of conserving time in the courts, nevertheless, the court should not unduly limit the time allowed an accused to present his summation to the jury. In the case before us, eighteen witnesses were examined, twelve for the state and six for the defense. The facts developed by the state to implicate the accused in the crime charged were involved and complicated, and, in our opinion, the trial court abused its discretion in restricting counsel for appellant to thirty minutes to argue this case to the jury.
Appellant also assigns as error the granting at the request of the state, Instruction Nos. 2 and 5. These instructions read as follows:
The Court instructs the jury for the State that if you believe from the evidence in this case, beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with the defendant's innocence, that he, the defendant, on or about the 31st day of October, 1973, in Pike County, Mississippi, did wilfully, unlawfully and feloniously discharge a shotgun into the dwelling house owned by J. Gordon Roach, which dwelling house was then and there occupied by the said J. Gordon Roach and his wife Katherine Roach, or, if you believe from the evidence in this case, beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with the defendant's innocence, that at *587 the said time and place, the defendant John Ray was present at and consenting to the commission of the said crime with which he is charged, and did any overt act which was immediately connected with or leading to its commission, then it is your sworn duty to find the defendant guilty as charged.
and,
The Court instructs the jury for the state that any person present, aiding, abetting, and consenting in the commission of a felony is indictable and triable as a principal, and if you believe from the evidence in this case, beyond a reasonable doubt, that on or about October 31, 1973, in Pike County, Mississippi, the defendant, John Ray, was present, consenting, aiding, and abetting and did any act to assist in shooting or discharging a shotgun into the dwelling of J. Gordon Roach, then it is your sworn duty to find the said John Ray guilty as charged.
Appellant objected to these instructions on the ground no evidence was presented to show that, if the accused was present, he was aiding, abetting or consenting to the crime charged. We are of the opinion that sufficient evidence was presented to justify the granting of the instructions, but on the retrial of the case, they should not be granted in the form given. Both instructions are objectionable for the reason that they assume that the crime charged was committed by another. Under the facts of this case, before appellant could be convicted as an accessory before the fact, the burden is upon the state to prove beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis that the crime charged was committed by another, and to further prove beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis that the accused was present, consenting, aiding and abetting such person in the commission of the crime charged. Consequently, on retrial the jury should be so instructed. Smith v. State, 237 Miss. 498, 115 So.2d 318 (1959), and Wages v. State, 210 Miss. 187, 49 So.2d 246 (1950).
We have considered the other errors assigned and find them to be without merit or not likely to reoccur on another trial.
For the reasons stated, this case must be and is reversed and remanded for another trial.
REVERSED AND REMANDED.
GILLESPIE, C.J., PATTERSON, P.J., and SMITH, ROBERTSON, SUGG, WALKER, BROOM and LEE, JJ., concur.