# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-KA-01509-SCT

*MARVIN TERRELL KING*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/23/2006 |
| TRIAL JUDGE: | HON. MARGARET CAREY-McCRAY |
| COURT FROM WHICH APPEALED: | WASHINGTON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF INDIGENT APPEALS |
| | BY: PHILLIP BROADHEAD |
| | LESLIE S. LEE |
| | HOWARD Q. DAVIS, JR. |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JOHN R. HENRY, JR. |
| DISTRICT ATTORNEY: | WILLIE DEWAYNE RICHARDSON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 08/26/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRAVES, P.J., DICKINSON AND CHANDLER, JJ.**

**CHANDLER, JUSTICE, FOR THE COURT:**

¶1.     Marvin Terrell King was convicted of the murder of Woquin Robinson, two counts of aggravated assault, and conspiracy. The Circuit Court of Washington County sentenced King to life in the custody of the Mississippi Department of Corrections for murder, fifteen years for each aggravated-assault conviction, and twenty years for conspiracy, with all sentences to run concurrently. In this appeal, King challenges the sufficiency of the evidence

of murder and the weight of the evidence. He also contends that forensic pathologist Dr. Stephen Hayne testified outside his area of expertise, and that this constituted plain error. Because the evidence was sufficient to permit a rational jury to find all the elements of murder, the verdict was not against the overwhelming weight of the evidence, and the admission of Dr. Hayne's testimony was not plain error, this Court affirms King's convictions and sentences.

## FACTS

¶2. At approximately 2:00 a.m. on May 9, 2004, the L&L Club in Leland, Mississippi, closed, discharging its patrons into the night. When Byron Jones left the L&L Club, he called Marvin King and expressed his anger at some other club patrons. King was at his home with Ja'Quarius Wright. Wright testified that, after speaking with Jones, King produced an SKS assault rifle and asked Wright if he wanted to check into the situation. Wright and King, with Wright driving, left in Wright's car, picked up Jones, and drove to the L&L Club. On the way, King passed Jones a .38 caliber handgun. According to Wright, Jones said he was angry and he was tired of people messing with him.

¶3. The three waited at the club and then drove to a nearby Double Quick convenience store. There they saw Robinson, along with Nacardis Williams, Derantez Blue, and Jimmy Lowe, whom Robinson had just picked up from the L&L Club. According to Jones, King said "Let's get him." The three parked at a carwash near the Double Quick and observed Robinson, Williams, Blue, and Lowe get into Robinson's car. Robinson was driving; Williams sat in the front passenger seat; Lowe sat in the back seat behind Robinson; and Blue sat next to Lowe.

2

¶4.     Wright, King, and Jones followed Robinson's car. Jones surmised that Robinson planned to drop off Williams at his girlfriend's house on Lewis Street. Jones testified that he and King agreed that, when Robinson dropped off Williams, King would shoot at the car, and Jones would shoot at Williams. Wright heard their plan. Wright dropped off King and Jones at the street corner. According to both Jones and Wright, when they exited the car, King had the rifle and Jones had the .38. Jones testified that he and King hid in the bushes and waited for Robinson's car to stop. When Williams exited the car, they opened fire. Jones testified that he fired two shots in Williams's direction, but with the intent to scare Williams, not to shoot him. Jones testified that he saw King rapid-fire the rifle at the car. Jones ran away and heard the firing continue. A bullet traveled into the car, through the driver's side headrest, and struck and killed Robinson. Blue and Lowe received minor bullet wounds.

¶5.     After the shooting, Jones and King met nearby. Jones called Wright, who picked them up. King instructed Wright to drive to the home of Charles Thomas. Once there, King called Thomas, who came outside. King handed the rifle to Thomas and asked him to hold the rifle for him. Then, King exited the car. Wright dropped off Jones several blocks away. Later, Thomas turned the rifle over to the police. Jones testified that he gave the .38 handgun to his brother Derrick, and that Derrick later traded it for another firearm.

¶6.     King, Wright, and Jones were indicted for murder, two counts of aggravated assault, and conspiracy. Jones testified that the State had offered him a plea deal of twenty years for manslaughter. He testified that his testimony was the truth and that he had not been promised a lighter sentence in exchange for it. Wright testified that he had not pleaded guilty; there

3

had been no plea offer from the State; and his testimony was motivated by a desire to do the right thing. Both Jones and Wright testified that they had lied in their prior statements to the police.

¶7.     Robinson's car had been riddled with bullet holes, and the police recovered seventeen shell casings at the scene. Starks Hathcock, of the Mississippi Crime Laboratory, matched sixteen of these shell casings to the rifle. He testified that the projectile that killed Robinson could not positively be included or excluded as having been fired by the rifle. But Dr. Hayne testified that, given the distance of the shooters in relation to the car, the fact that the fatal bullet had traveled through the car and the headrest, and the condition of Robinson's wound, the murder weapon was most probably a high-velocity weapon such as a rifle, not a .38 handgun.

¶8.     The defense attempted to create reasonable doubt by highlighting inconsistencies in the testimony, especially the fact that Williams had identified Jones's brother, Derrick Jones, as the second shooter. Williams gave a statement to the police identifying the "Jones Boys" as the shooters; he stated that he was sure that Jones and Derrick were the shooters. However, Williams stated that he had not seen the shooters until after the gunfire had begun. Lowe testified that Derrick had been with Jones, King, and Wright in Wright's car when it had circled the Double Quick. Lieutenant Juan Overton testified that he had seen Derrick and Jones leave the L&L Club separately at approximately 2:00 a.m. When Jones left, he had burst angrily out of the club and cursed. Shortly thereafter, Derrick had left with his girlfriend and others. Lieutenant Overton testified that, when he investigated Derrick's whereabouts at the time of the shooting, he discovered that Derrick had checked into a motel

4

in Greenville with his girlfriend shortly after 2:00. a.m. The motel clerk identified Derrick from a photo line-up, and Derrick had filled out a card upon check-in. Lieutenant Overton testified that, based on this information, Derrick was excluded as a suspect.

¶9. A cautionary jury instruction was given concerning the accomplice testimony of Jones and Wright. The jury found King guilty of the murder of Robinson, the aggravated assault of Lowe and Blue, and conspiracy.

## **DISCUSSION**

I. WHETHER THE EVIDENCE SUPPORTING THE MURDER CONVICTION WAS SUFFICIENT TO SUPPORT THE VERDICT.

¶10. King filed a motion for a judgment notwithstanding the verdict (JNOV), which was denied by the trial court. King argues that the State's evidence consisted of accomplice testimony from Jones and Wright that was substantially impeached on cross-examination, and that the evidence evinced an incomplete police investigation. Therefore, he argues, the evidence was not sufficient to support the verdict of guilty of murder. In King's brief, he limits his sufficiency arguments to the murder conviction. Accordingly, this Court confines the sufficiency analysis to the evidence supporting King's murder conviction.

¶11. In reviewing the sufficiency of the evidence, the relevant question is whether, considering the evidence in the light most favorable to the verdict, a rational jury could have found every essential element of the offense beyond a reasonable doubt. ***Bush v. State***, 895 So. 2d 836, 843 (Miss. 2005) (quoting ***Jackson v. Virginia***, 443 U.S. 307, 315, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). We will affirm if the evidence is of "such quality and weight that, 'having in mind the beyond a reasonable doubt burden of proof standard, reasonable

5

fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense.'" *Id.* (quoting *Edwards v. State*, 469 So. 2d 68, 70 (Miss.1985)). We will reverse and render the conviction if the facts and inferences, although considered in the light most favorable to the verdict, "point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty." *Id.*

¶12. In order to establish King's guilt of murder, the State was required to prove beyond a reasonable doubt that King killed Robinson without the authority of law and with deliberate design to effect his death. *See* Miss. Code Ann. § 97-3-19 (Rev. 2006). In addition to a murder instruction, the trial court also gave jury instructions on accomplice liability that allowed the jury to find King guilty of murder if it found that another person who acted in concert with King killed Robinson. Mississippi Code Section 97-1-3 provides: "Every person who shall be an accessory to any felony, before the fact, shall be deemed and considered a principal, and shall be indicted and punished as such; and this whether the principal have been previously convicted or not." Miss. Code Ann. § 97-1-3 (Rev. 2006). This Court has defined aiding and abetting as "the offense committed by those persons who, although not the direct perpetrators of a crime, are yet present at its commission, doing some act to render aid to the actual perpetrator." *Smith v. State*, 237 Miss. 498, 506, 115 So. 2d 318, 322 (1959) (quoting *Wynn v. State*, 63 Miss. 260 (1885)). The State must prove that the defendant was "present, consenting, aiding, and abetting such person in the commission of the crime charged." *Brooks v. State*, 763 So. 2d 859, 861 (Miss. 2000) (quoting *Van Buren v. State*, 498 So. 2d 1224, 1227 (Miss. 1986) (overruled on other grounds)). "Aiding

6

and abetting in the commission of a crime involves a community of unlawful purpose at the time the act was committed." ***Shedd v. State***, 228 Miss. 381, 386, 87 So. 2d 898, 900 (1956).

¶13.    King points to certain discrepancies brought out during the testimony of accomplices Jones and Wright. The following are the most glaring discrepancies identified by King. Both Jones and Wright gave prior statements to the police that were inconsistent with their trial testimony. In Jones's initial statement, he denied his own involvement in the shooting. During Jones's testimony, he initially said that King had made the comment that he was "tired of these weak-a-- n-----s and this b-------t." But when pressed, Jones admitted that he, not King, had made that statement. Wright gave two statements to the police that conflicted with his trial testimony. In the first statement, Wright said he and King had been driving around that night and they had not seen Jones at all. In the second statement, he said King had no weapon when he exited the car at the scene of the shooting, and that neither Jones nor King had weapons when he picked them up. Also, Wright previously had claimed that Jones had admitted having fired shots at the car, while at trial, Wright testified that Jones had said he had hidden in the bushes during the shooting. King also points to discrepancies in the testimony concerning who passed the rifle out of the car window to Thomas. On direct examination, Wright said King had passed Thomas the rifle, but on cross-examination admitted he had told police that both King and Jones had passed Thomas the rifle. King argues that the testimony established a motive for Jones, not King. King asserts that, from Jones's and Wright's testimony, it was impossible for the jury to determine what happened the night of the shooting.

7

¶14.    The Court finds that, viewing the evidence and all reasonable inferences to be drawn from the evidence in the light most favorable to the verdict, the evidence was sufficient to enable a rational jury to find beyond a reasonable doubt that King committed all the elements of murder. Generally, the resolution of conflicts in the witness testimony is a matter for the jury, not the court. *Christmas v. State*, 10 So. 3d 413, 423 (Miss. 2009). Concerning the sufficiency of the evidence when a conviction rests upon accomplice testimony, the uncorroborated testimony of an accomplice may be sufficient to convict the accused. *Williams v. State*, 32 So. 3d 486, 490 (Miss. 2010). But if the accomplice testimony is uncorroborated and is unreasonable, self-contradictory, or substantially impeached, then accomplice testimony is insufficient, and the trial court must direct a verdict of not guilty. *Id.* (quoting *Ballenger v. State*, 667 So. 2d 1242, 1253 (Miss. 1995)).

¶15.    The Court finds that the testimony of accomplices Jones and Wright was not unreasonable, self-contradictory, or substantially impeached. Thomas testified that he was with Wright and King at King's house that night. Wright testified that, after getting a call from Jones, King got a rifle and they drove to pick up Jones. Thomas testified that King had shown him this rifle months before. Jones testified he was picked up by King and Wright. Lowe testified that he saw King in Wright's car as it circled the Double Quick. Jones and Wright testified that King and Jones had formulated a plan in which King would shoot at the car and Jones would shoot at Williams. Jones testified that he saw King fire numerous shots at the car, and heard more shots fired as he ran away. Thomas, who cooperated with the police and was not an accessory before the fact, testified that, after the shooting, King had

8

arrived in a car with Wright and Jones, had given him the rifle, and had asked him to hold it for him. This testimony corroborated that of Wright and Jones.

¶16. King also asserts that the State's evidence rested upon an incomplete police investigation into the possibility that Derrick was the second shooter. He points out that Sergeant Byron Vaughn testified that his conversation with Williams led him to suspect King and Jones. On cross-examination, Sergeant Vaughn admitted that Williams had identified Derrick as a shooter, but that he had been excluded on the basis of alibi. The police records included no information about the investigation of Derrick's alibi. King argues that the investigation was incomplete and that the evidence established Derrick should not have been excluded as a suspect because Williams had identified him as the second shooter, and the exact time that Derrick had checked into the hotel had not been established.

¶17. Although Williams stated that he was sure Derrick was the second shooter, the police determined that Derrick had checked into a hotel in Greenville at approximately the same time as the shooting. The determination that Derrick was not the second shooter additionally was supported by: (1) the motel check-in card, (2) the motel clerk's identification of Derrick, (3) the fact that Lieutenant Overton had seen Derrick leave the L&L Club separately from Jones, (4) the inference that Williams may not have seen clearly the second shooter during the gunfire, and (5) the evidence that King was the second shooter.

¶18. The evidence and all reasonable inferences to be drawn therefrom, taken in the light most favorable to the verdict, were sufficient to enable the jury to find King guilty of the essential elements of murder. Moreover, even if the jury believed that Jones, not King, fired the fatal bullet, the above evidence was sufficient to find King guilty as a principal under an

9

accomplice-liability theory. This is because the evidence, taken in the light most favorable to the verdict, sufficiently established that King was "present, consenting, aiding, and abetting [Jones] in the commission of the crime charged," and that King and Jones had shared a community of unlawful purpose. *Brooks*, 763 So. 2d at 861 (Miss. 2000) (quoting *Van Buren*, 498 So. 2d at 1227); *Shedd*, 228 Miss. at 386, 87 So. 2d at 900. This issue is without merit.

> II. WHETHER THE VERDICT WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.

¶19. A challenge to the weight of the evidence is raised in a motion for a new trial, and is addressed to the trial court's discretion. *Bush*, 895 So. 2d at 844. On review, this Court will disturb a verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. *Id.* Unlike a reversal based on the sufficiency of the evidence, a reversal based on the weight of the evidence does not indicate that acquittal was the only proper verdict. "Rather, as the 'thirteenth juror,' the court simply disagrees with the jury's resolution of the conflicting testimony." *Id.* Nonetheless, the power to grant a new trial should be exercised only where the evidence preponderates heavily against the verdict. *Id.*

¶20. King argues that inconsistencies in the testimony, the evidence of inadequate police investigation, and the fact that Williams had identified Derrick as the second shooter rendered the verdict against the overwhelming weight of the evidence. King argues that Jones was not credible because he had a plea recommendation from the State of twenty years for manslaughter, which motivated him to lie to implicate King. King also points out that

10

Derrick was Jones's brother and Wright's cousin, which King posits, shows that Jones and Wright had a motive for framing King to exculpate Derrick.

¶21. We find that the evidence did not preponderate so heavily against the verdict that the failure to grant a new trial would sanction an unconscionable injustice. The basic evidence supporting the verdict was that King and Jones had entered into a conspiracy to shoot at Robinson's car and its occupants, that they were armed with guns when Wright dropped them off, that Jones saw and heard King shoot at the car, that King gave the rifle to Thomas, and that Robinson was killed and two occupants injured in the shooting. It is true that there were some inconsistencies in the testimony and that the accomplices' trial testimony varied from their prior statements to the police. However, the testimony of Jones and Wright was identical in material particulars. The nature of Jones's plea offer and the familial relationships were explored thoroughly at trial. Nothing about this evidence so erodes the credibility of the accomplice testimony as to compel this Court's reversal of the jury verdict. The verdict of guilty of murder, conspiracy, and two counts of aggravated assault was not against the overwhelming weight of the evidence.

III. WHETHER DR. HAYNE'S OPINION THAT A RIFLE WAS THE MURDER WEAPON EXCEEDED THE SCOPE OF HIS EXPERTISE AND CONSTITUTED PLAIN ERROR.

¶22. Dr. Hayne was qualified to render expert testimony in the area of forensic pathology. Accordingly, he testified about his autopsy findings as to the cause of death and the manner of death. Dr. Hayne testified that Robinson was killed by a bullet that struck him in the back of the head. The prosecution also elicited testimony from Dr. Hayne concerning the probable velocity of the fatal bullet, given the characteristics of the wound, the distance of the

11

shooters, and the opinion that, because the bullet had traveled through the car and through the headrest before striking Robinson, the bullet was fired from a high-velocity weapon such as an SKS rifle. Dr. Hayne also gave the following detailed information about bullet velocity:

Q. Are you familiar with the, as far as projectiles or shots being fired from a .38 caliber handgun, as far as what manner or what speed they travel?

A. They travel, for lead ball ammunition, wide cutter ammunition, they would be traveling out of a .38 at about 750, 800 feet per second.

Q. Are you familiar with it as from an SKS?

A. Yes.

Q. What is that?

A. The velocity at the muzzle of an SKS would be approximately 2650 feet per second.

Q. How does that affect your determination?

A. Well, the velocities, counselor, correspond significantly to the amount of kinetic energy. As you increase the velocity, the amount of force goes up to the square. You multiply the velocity times the velocity.
   The velocity becomes a critical issue in determining amount of force in a bullet when it strikes a target. If you increase the mass of the bullet by doubling it, it increases the kinetic energy by a factor of two. If you double the velocity, the speed of the bullet, it increases the force by a factor of four. So, you can see that velocity is more important than mass, the weight of the bullet.
   Speed becomes a critical issue. The faster the bullet is going, the more the striking power, the more the kinetic energy, the more force that the bullet has. That's why bullets are made with high velocity capability. Military rounds have high velocity weapons because of the injuries that they can inflict with them.

Q. So, Dr. Hayne, in your opinion, what type of weapon caused the injuries to Woquin Robinson?

A. Given the scenario you gave me, the distances, two intermediate targets, and the injuries observed, I would favor a long barreled weapon, a rifle weapon.

¶23. King argues that Dr. Hayne went beyond his expertise as a forensic pathologist by testifying in the field of weaponry and ballistics. "Counsel must object contemporaneously to inadmissible evidence in order to preserve the error for appeal." *Boyd v. State*, 977 So. 2d 329, 337 (Miss. 2008). King admits that he did not object contemporaneously to Dr. Hayne's testimony. He urges our consideration of his argument under the plain-error doctrine, which permits this Court to review an "obvious error which was not properly raised by the defendant on appeal, and which affects a defendant's 'fundamental, substantive right.'" *Smith v. State*, 986 So. 2d 290 (Miss. 2008). "It has been established that where fundamental rights are violated, procedural rules give way to prevent a miscarriage of justice." *Gray v. State*, 549 So. 2d 1316, 1321 (Miss. 1989).

¶24. For his argument that the admission of Dr. Hayne's testimony constituted plain error, he cites *Edmonds v. State*, 955 So. 2d 787 (Miss. 2007). In *Edmonds*, Dr. Hayne had testified that, from his examination of the murder victim, the fatal wound was consistent with two people having held the gun when it was fired. *Id.* at 791. The Court found that this opinion was scientifically unfounded. *Id.* at 792. We stated:

> While Dr. Hayne is qualified to proffer expert opinions in forensic pathology, a court should not give such an expert carte blanche to proffer any opinion he chooses. There was no showing that Dr. Hayne's testimony was based, not on opinion or speculation, but rather on scientific methods and procedures. The State made no proffer of any scientific testing performed to support Dr. Hayne's two-shooter theory. Therefore, the testimony pertaining to the two-shooter theory should not have been admitted under our standards.

13

*Id.* (citation omitted). This Court further found that Edmonds had been substantially prejudiced by the admission of the testimony. *Id.* This was because Dr. Hayne's testimony had the imprimatur of scientific expertise and because it was the only evidence other than Edmonds's contested confession that supported the State's theory. *Id.* Edmonds had preserved the issue for appellate review. *Id.*

¶25. King also cites *Wilson v. State*, 21 So. 3d 572, 588 (Miss. 2009), for the proposition that this Court affords plain-error review to the improper admission of testimony by Dr. Hayne. King's argument is misplaced, because that was not the holding of *Wilson*. Wilson argued that, based upon *Edmonds*, Dr. Hayne's credibility in the area of forensic pathology and the reliability of his testimony was objectively questionable in every case, and also that its admission violated his due-process rights. *Id.* at 588. This Court held that the argument was procedurally barred for lack of an objection. *Id.* However, in the alternative to the procedural bar, this Court addressed Wilson's arguments and found them to be without merit. *Id.* at 589. We found that *Edmonds* did not hold that Dr. Hayne was not qualified to testify as an expert witness in the area of forensic pathology. *Id.* In its analysis in *Wilson*, this Court did not invoke plain-error review.

¶26. This issue is procedurally barred for lack of an objection. *Boyd*, 977 So. 2d at 337. But even if Dr. Hayne's testimony exceeded the scope of his expertise in forensic pathology, its admission does not implicate plain-error review. Because Hathcock, the ballistics expert, was unable to match the bullet retrieved at the autopsy with the SKS rifle, Dr. Hayne's testimony was the only evidence that purported to link the fatal bullet with the SKS rifle. But even without the testimony that the wound was consistent with having been fired by the SKS

14

rifle, the evidence was sufficient to enable the jury to find King guilty of murder. Wright saw King exit the car with the rifle, and he saw Jones exit the car with the .38. Jones testified that King had fired the rifle at the car, and he had fired at Williams with the .38. From this evidence, it is reasonable to infer that the fatal bullet came from the SKS rifle fired by King. Even if the jury believed that the fatal bullet came from the .38 fired by Jones, the evidence sufficiently established King's guilt as an aider and abetter. Therefore, plain-error review is not implicated by the admission of Dr. Hayne's testimony.

## CONCLUSION

¶27. The evidence was sufficient to support the murder conviction, and the verdict of guilt of murder, two counts of aggravated assault, and conspiracy was not against the overwhelming weight of the evidence. The admission of Dr. Hayne's testimony did not constitute plain error. Therefore, we affirm King's convictions and sentences.

¶28. **COUNT I: CONVICTION OF CONSPIRACY AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH CONDITIONS, AFFIRMED. COUNT II: CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH CONDITIONS, AFFIRMED. COUNT III: CONVICTION OF AGGRAVATED ASSAULT AND SENTENCE OF FIFTEEN (15) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH CONDITIONS, AFFIRMED. COUNT IV: CONVICTION OF AGGRAVATED ASSAULT AND SENTENCE OF FIFTEEN (15) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH CONDITIONS, AFFIRMED. SENTENCES IN COUNTS I, II, III AND IV SHALL RUN CONCURRENTLY WITH EACH OTHER.**

**WALLER, C.J., CARLSON AND GRAVES, P.JJ., DICKINSON, RANDOLPH, LAMAR, KITCHENS AND PIERCE, JJ., CONCUR.**