# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2022-KA-00696-SCT

*JAMECO DAVIS a/k/a  JAMECO AERION DAVIS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/28/2022 |
| TRIAL JUDGE: | HON. DEBRA W. BLACKWELL |
| TRIAL COURT ATTORNEYS: | SHAMECA SHANTE' COLLINS |
| | BARBARA A. BLUNTSON |
| | MATTHEW DILLARD BUSBY |
| COURT FROM WHICH APPEALED: | ADAMS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: MOLLIE M. McMILLIN |
| | GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: CASEY B. FARMER |
| DISTRICT ATTORNEY: | SHAMECA SHANTE' COLLINS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | VACATED IN PART; AFFIRMED IN PART - 01/18/2024 |
| MOTION FOR REHEARING FILED: | |

## CONSOLIDATED WITH
## NO. 2022-KA-00721-SCT

*JACQLAURENCE JACKSON*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/28/2022 |
| TRIAL JUDGE: | HON. DEBRA W. BLACKWELL |
| COURT FROM WHICH APPEALED: | ADAMS COUNTY CIRCUIT COURT |

ATTORNEY FOR APPELLANT:          KATHRINE C. CURREN
ATTORNEY FOR APPELLEE:           OFFICE OF THE ATTORNEY GENERAL
                                 BY:  CASEY B. FARMER
NATURE OF THE CASE:              CRIMINAL - FELONY
DISPOSITION:                     VACATED IN PART; AFFIRMED IN PART-
                                 01/18/2024
MOTION FOR REHEARING FILED:

**BEFORE RANDOLPH, C.J., COLEMAN AND CHAMBERLIN, JJ.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1.     Jameco Davis and Jacqlaurence Jackson were convicted of two counts of first-degree murder after a drive-by shooting in Natchez.  Both Jameco Davis and Jackson appeal their convictions and sentences arguing that the trial court erred by adding a firearm enhancement to the sentences, that the trial court erred by failing to follow proper procedure for review of a **Batson**[1] challenge and that the verdict is against the overwhelming weight of the evidence. Jackson alone argues that the evidence is insufficient to support the verdict, that the trial court erred by denying his motion to sever and have separate trials and that the cumulative effect of these errors requires reversal.  This Court finds that the firearm enhancement portions of the sentences should be vacated and that all other issues are without merit.

**FACTS AND PROCEDURAL HISTORY**[2]

¶2.     On November 9, 2018, Natchez police officers Joseph Belling and Ernest Clemons

---

[1] **Batson v. Kentucky**, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

[2] The facts of this case as they appear in the light most favorable to the verdict are given below. Arguments as to additional factual discrepancies are addressed in the discussion.

responded to a report of a black Honda Accord that had crashed into a cement wall in the parking lot of the Stewpot located at the corner of Auburn Avenue and East Franklin Street in Natchez. The dead bodies of Tavonte White, in the driver's seat, and Alicia Justice, in the passenger seat, were found in the vehicle with multiple gunshot wounds.

¶3. Officer Belling collected 9-millimeter shell casings, .40-caliber shell casings, and .223-caliber shell casings from the ground at the crime scene. Officer Belling also observed multiple bullet holes in the passenger's side of the vehicle and bullet exit holes on the driver's side of the vehicle. Officer Clemons, who was the lead investigator on the case, obtained surveillance video footage from multiple stores around the scene and determined that the suspects had been driving a 2008 Chevrolet Cobalt in a "silver and gray" color. The surveillance footage showed a silver sedan accelerating towards the Honda. The sedan drove beside the Honda for a moment before the Honda veered off and the sedan drove away.

¶4. In February 2021, Kendarrius Davis was in the Adams County jail undergoing questioning about a separate incident. During an interview with investigators, Kendarrius confessed to having information about the murder of White and Justice. Kendarrius told Officer Clemons that he was riding around Natchez in a car with Makaileus Johnson, Jameco Davis and Jacqlaurence Jackson when they saw White and began shooting at his vehicle.[3] Officer Clemons believed Kendarrius's statement because Kendarrius knew information that only someone at the scene could have known—which side of the car the bullets had entered and names and calibers of weapons that matched the recovered shell casings.

---

[3]For clarity, Jameco Davis and Kendarrius Davis will be referred to by their first names.

¶5.     In reliance on Kendarrius's confession, Officer Clemons issued warrants for Jackson and Jameco.[4]  Jackson and Jameco were arrested and both waived their **Miranda**[5] rights to speak with Officer Clemons.  Their interviews were recorded and played for the jury at trial.

¶6.     Jackson denied any involvement in the crime and claimed to be with his girlfriend on the night of the crime.  Jameco also denied any involvement in the crime and claimed to be in Texas during the time of the incident.  Officer Clemons questioned Jameco about an Instagram video that showed Kendarrius and him together.  In the video, Jameco makes statements that he "hit the blunt seven times like [he] hit Bleek"[6] and he was "smokin on an op."  Officer Clemons interpreted Jameco's statements to be a confession that he was responsible for the death of White.  Jameco agreed that he was in that video and that he made those statements but, nevertheless, denied any involvement in the shooting.

¶7.     On October 10, 2021, Kendarrius recanted his original statement implicating Jameco and Jackson.  Instead, Kendarrius stated that Ken Owens, Woo[7] and Dun Owens were responsible for killing White and Justice.[8]  On March 7, 2022, Kendarrius recanted his October 10, 2021 recantation, claiming that it was false and had been made because he feared for his life.

¶8.     On November 17, 2021, Kendarrius, Jameco and Jackson were each indicted, under

_____

[4]A warrant was not issued for Makaileus Johnson because he was deceased.

[5]**Miranda v. Arizona**, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[6]White's nickname was Bleek

[7]Johnson's nickname was Woo.

[8]All three of these people were deceased at the time Kendarrius made this statement.

4

Mississippi Code Section 97-3-19(1)(a) (Supp. 2017), for one count of first-degree murder for the death of Justice; one count of first-degree murder for the death of White; and, under Mississippi Code Section 97-37-37(1) (Rev. 2014), for "using or displaying a firearm during the commission of the offense."

¶9. Jameco and Jackson were tried together on June 22-24, 2022, and Kendarrius, who pleaded guilty, testified against them at trial. Kendarrius testified that he was "chilling, riding, and smoking" in Natchez with Jackson, Jameco and Johnson. Jackson was driving, Johnson was in the front passenger's seat, Jameco was behind the driver's seat and Kendarrius was behind the front passenger's seat. Kendarrius noticed that Jameco had an assault rifle and that Johnson had a pistol. During the ride, Jackson saw White, who was nicknamed Bleek, in a car driving near them. Kendarrius heard Jackson say, "There go Bleek." Jackson proceeded to speed up, and Jameco and Johnson began shooting into White's vehicle. Kendarrius, however, did not personally witness Jameco firing the gun because he dropped to the floor of the car when the shooting began.

¶10. The jury found both Jameco and Jackson guilty of two counts of first-degree murder. Jameco and Jackson were both sentenced to life in prison. The trial judge added a firearm enhancement to both Jameco's and Jackson's sentences under Section 97-37-37(1), adding an additional five years for each count of first-degree murder that would run consecutive to the life sentences and consecutive to each enhancement.

¶11. On July 1, 2022, Jameco filed a motion for a new trial. On July 5, 2022, Jackson filed a motion for a new trial or, in the alternative, a motion for judgment notwithstanding the

5

verdict. Both motions were denied by the trial court. Both Jameco and Jackson timely appealed. This Court consolidated the appeals and retained jurisdiction. Order, ***Davis v. State***, No. 2022-KA-00696-SCT (Miss. Apr. 12, 2023).

## ISSUES PRESENTED

¶12. On appeal, Jameco and Jackson's arguments are best summarized as follows:

I.    Whether the trial court erred by adding a firearm enhancement to the sentences.

II.    Whether the trial court erred by failing to follow proper procedure for review of a ***Batson*** challenge.

III.    Whether the verdict is against the overwhelming weight of the evidence.

¶13. Only Jackson argues on appeal:

IV.    Whether the evidence is insufficient to support the verdict.

V.    Whether the trial court erred by denying Jackson's motion to sever and have separate trials.

VI.    Whether the cumulative errors that occurred at trial denied Jackson his fundamental right to a fair trial.

## DISCUSSION

**I.    Whether the trial court erred by adding a firearm enhancement to the sentences.**

¶14. This Court gives deference to a trial court's imposition of a sentence. ***Reynolds v. State***, 585 So. 2d 753, 756 (Miss. 1991) ("The imposition of a sentence is within the discretion of the trial court[.]" (citing ***Reed v. State***, 536 So. 2d 1336, 1339 (Miss. 1988))). Neither Jameco nor Jackson objected to the firearm enhancement before the trial court, so

6

this Court reviews this issue for plain error. This Court has held that the plain error doctrine applies to illegal sentencing because "[a]n accused has a fundamental right to be free of an illegal sentence." *Grayer v. State*, 120 So. 3d 964, 969 (Miss. 2013) (citing *Kennedy v. State*, 732 So. 2d 184, 186 (Miss. 1999)). An illegal sentence is one that "exceeds the maximum statutory penalty for the crime." *Id.* (citing *House v. State*, 754 So. 2d 1147, 1150 (Miss. 1999)).

¶15.    Both defendants were sentenced under Section 97-37-37(1) to an additional five years added to each count of first-degree murder that would run consecutive to each enhancement and to the life sentences. Section 97-37-37(1) states:

> (1)    Except to the extent that a greater minimum sentence is otherwise provided by any other provision of law, any person who uses or displays a firearm during the commission of any felony shall, in addition to the punishment provided for such felony, be sentenced to an additional term of imprisonment in the custody of the Department of Corrections of five (5) years, which sentence shall not be reduced or suspended.

Miss. Code Ann. § 97-37-37(1).

¶16.    On appeal, both defendants argue that the firearm enhancement sentence is illegal because the jury did not find the elements of the enhancements and "a greater minimum sentence is otherwise provided by" Mississippi Code Section 97-3-21(1) (Rev. 2014) for first-degree murder. Miss. Code Ann. § 97-37-37(1). The State concedes that Jameco and Jackson's enhancements are illegal because "the firearm enhancement should not apply to sentences for first-degree murder."

¶17.    All parties rely on this Court's holding in *Harris v. State* to support their arguments that Jameco and Jackson's sentence enhancements are illegal. *Harris v. State*, 99 So. 3d 169,

7

172 (Miss. 2012). In *Harris*, this Court vacated the firearm enhancement imposed under Mississippi Code Section 97-37-37(2) because Harris was a habitual offender who was required by statute to be sentenced to the maximum sentence for aggravated assault, twenty years. *Harris*, 99 So. 3d at 172; Miss. Code Ann. § 97-37-37(2); Miss. Code Ann § 97-3-7(2); Miss. Code Ann. § 99-19-81. Harris was sentenced under the second portion of Section 97-37-37, which stated:

> Except to the extent that a greater minimum sentence is otherwise provided by any other provision of law, any convicted felon who uses or displays a firearm during the commission of any felony shall, in addition to the punishment provided for such felony, be sentenced to an additional term of imprisonment in the custody of the Department of Corrections of ten (10) years, to run consecutively, not concurrently, which sentence shall not be reduced or suspended.

*Harris*, 99 So. 3d at 172 (emphasis omitted) (quoting § 97-37-37(2)). This Court found that the minimum sentence Harris could have received was twenty years, which was greater than the ten-year sentence provided for in Section 97-37-37(2). *Id.* Harris's sentence was vacated, and his case was remanded for another sentencing hearing. *Id.* at 174.

¶18. This Court vacates the firearm enhancement portion of both Jameco's and Jackson's sentences. The mandatory minimum and maximum sentence for first-degree murder is life. Miss. Code Ann. § 97-3-21(1) ("Every person who shall be convicted of first-degree murder shall be sentenced by the court to imprisonment for life in the custody of the Department of Corrections."). A life sentence is greater than the five years provided for in Section 97-37-37(1). Accordingly, a firearm enhancement under Section 97-37-37(1) is prohibited because "a greater minimum sentence is otherwise provided by" Section 97-3-21(1).

8

## II. Whether the trial court erred by failing to follow proper procedure for review of a *Batson* challenge.

¶19. This Court reviews *Batson* challenges for clear error and gives great deference to the findings of the trial court. *Clark v. State*, 343 So. 3d 943, 961 (Miss. 2022). "On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2244, 204 L. Ed. 638 (2019) (internal quotation marks omitted) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 477, 128 S. Ct. 1203, 170 L. Ed. 2d 175 (2008)). In determining whether a party has used its peremptory strikes to racially discriminate against potential jurors, this Court utilizes the following analysis:

> First, the defendant must establish a prima facie case of discrimination in the selection of jury members. The prosecution then has the burden of stating a racially neutral reason for the challenged strike. If the State gives a racially neutral explanation, the defendant can rebut the explanation. Finally, the trial court must make a factual finding to determine if the prosecution engaged in purposeful discrimination. If the defendant fails to rebut, the trial judge must base his decision on the reasons given by the State.

*Berry v. State*, 802 So. 2d 1033, 1037 (Miss. 2001) (citations omitted).

¶20. Jackson's counsel raised this *Batson* challenge after the State struck potential juror Rosie Jackson. Counsel for Jackson asked for a nonracial reason from the State for striking every black juror they had but then narrowed the challenge to specifically challenge the strike for Rosie. The following conversation occurred:

> BY THE COURT: Ms. Bluntson, what's your reason for striking Ms. Jackson?
>
> BY MS. BLUNTSON: I had the reason written down, Your Honor. I believe if I'm not mistaken, we may have some information on Ms. Jackson regarding family members being involved some criminal matters concerning -- I think the family member of the one of the victims involved in a crime. I am not sure. We were speaking with our -- I am sorry.

9

BY THE COURT: That's okay.

BY MS. BLUNTSON: I don't have it written down, Your Honor.

BY THE COURT: But what is it as you recall? Is information from your office or from --

BY MS. BLUNTSON: From one of the investigators, detectives providing information on the juror, and we thought that it was information worthy of a strike. I didn't record it.

BY THE COURT: All right.

BY MS. BLUNTSON: But certainly not because she's African American. I know that we have to show a race neutral reason.

Counsel for Jackson countered that he did not have any information or notes on Rosie, and the trial judge clarified that the State had received information from an investigator in its office. Counsel for Jackson asked if that information could be made available to them, and the State mentioned that "everyone we spoke with is still across the hall." Counsel for Jameco agreed that they too did not have any notations on Rosie and asked the court to require the State to use a strike for cause. The State further stated its reason:

> It was a member of the victim's family if I am not mistaken that may have been involved -- in one of the victims of Mr. White's family member may have been involved in criminal activity involving this individual which she did not speak on that during voir dire, but I am not certain.

The Court then stated, "The Court finds that's a race neutral reason, and the Court is going to allow that challenge. That will be S 11."

¶21. The State challenges Jameco's right to argue this issue on appeal because counsel for Jackson raised the challenge. The State relies on persuasive caselaw to support its argument. See **McFarland v. State**, 297 So. 3d 1110, 1118 (Miss. Ct. App. 2020); **United States v.**

10

***Pofahl***, 990 F.2d 1456, 1465 (5th Cir. 1993). The record, however, evidences that counsel for Jameco requested during the ***Batson*** challenge that the court require the State to use a strike for cause and noted the lack of response from Rosie during voir dire. Although Jameco's counsel did not raise the initial challenge, they did comment and participate in the challenge such that their argument will be allowed on appeal.

¶22. On appeal, Jameco and Jackson argue that the State was unable to articulate a race neutral reason for striking the juror at issue. The State argues that it gave a race neutral reason.

¶23. Although not eloquent, the State did articulate its race neutral reason: it had received information from an investigator in its office that related criminal activity between one of the family members of one of the victims and one of the juror's family members. "The Court has recognized that the criminal history of a potential juror's family member is a race neutral reason for exercising a peremptory strike." ***Jones v. State***, 252 So. 3d 574, 581 (Miss. 2018). Additionally, this Court has allowed prosecutors to use information supplied by a third party as a race neutral reason to strike potential jurors. ***Pruitt v. State***, 986 So. 2d 940, 945 (Miss. 2008).

¶24. Jameco and Jackson further argue that the trial court did not complete the third step of a ***Batson*** review because it failed to make a determination as to whether the reason given by the State was a pretext for racial discrimination. The State argues that the trial court's statement was a sufficient finding to satisfy the ***Batson*** analysis, but counsel for Jameco and Jackson failed to meet their burden to show that the State's strike was pretextual.

11

¶25.    Both Jameco and Jackson rely on ***Hardison v. State*** to support their arguments that the trial court committed reversible error by failing to complete the third step of the ***Batson*** analysis.  ***Hardison v. State***, 94 So. 3d 1092, 1097 (Miss. 2012).  In ***Hardison***, the defendant used a peremptory strike on a potential juror, and the State made a ***Batson*** challenge.  ***Id.*** at 1099.  Hardison stated that based on the juror's responses, the defense struck the juror for favoring the prosecution.  ***Id.*** The trial judge found that the reason given was not race neutral and thus the defendant had not satisfied the second step of a ***Batson*** analysis.  ***Id.*** at 1100. The juror went on to be seated in the jury.  ***Id.***

¶26.    On appeal, this Court stated that "it is at the third-step (pretext) — not the second step of the analysis — that persuasiveness becomes relevant.  The second step of the analysis does not even require the explanation to be 'plausible.'" ***Id.*** (citing ***Purkett v. Elem***, 514 U.S. 765, 767-68, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995)).  On appeal, this Court found the trial court had committed reversible error and had deprived Hardison of his right to a peremptory strike by his failure to follow all three steps of the ***Batson*** analysis.  ***Id.*** at 1101-02.  This Court stated that the trial court should have found Hardison's reason to be race neutral and allowed the State an opportunity to meet its burden of proving pretext.  ***Id.***

¶27.    The State's argument in this case centers on that very issue, as it contends that Jameco and Jackson, when given the opportunity, failed to meet their burden to show that the State's strike was a pretext for racial animus.  The State argues that the "ultimate burden of persuasion regarding racial motivation" never shifted from Jameco and Jackson, the opponent of the strike. ***Jones***, 252 So. 3d at 582 (quoting ***Rice v. Collins***, 546 U.S. 333, 338,

126 S. Ct. 969, 163 L. Ed. 2d 824 (2006); *see Pruitt*, 986 So. 2d at 943 ("The burden remains on the opponent of the strike to show that the race-neutral explanation given is merely a pretext for racial discrimination." (quoting *Hicks v. State*, 973 So. 2d 211, 219 (Miss. 2007))).

¶28. Additionally, the State avers that it is not reversible error if the trial court fails to make an on-the-record statement about a lack of pretext. *Puckett v. State*, 788 So. 2d 752, 764 (Miss. 2001) ("Where a trial judge fails to elucidate such a specific explanation for each race neutral reason given, we will not remand the case for that *Batson*-related purpose alone." (internal quotation mark omitted) (quoting *Gary v. State*, 760 So. 2d 743, 748 (Miss. 2000))). "[W]hile the trial court should make on-the-record findings on each race-neutral reason provided by the State, as long as the record provides a basis in fact for the trial court's ruling, reversal is not required." *Corrothers v. State*, 148 So. 3d 278, 307 (Miss. 2014) (citing *Pruitt*, 986 So. 2d at 946).

¶29. The record reveals very little evidence that the State used its peremptory strikes in a discriminatory manner. The trial transcript evidences that counsel for Jackson alleged that the State had used peremptory strikes on many black potential jurors and that they challenged the peremptory strike on Rosie, a black potential juror, specifically. Other than these statements by counsel for Jackson, this Court does not know the racial makeup of the venire or the use of the additional peremptory strikes. Neither Jameco nor Jackson put forth additional evidence before the trial court to prove that the reason given as to Rosie was pretextual. *See Flowers*, 139 S. Ct. at 2243 (stating that defendants may introduce "statistical

evidence about the prosecutor's use of peremptory strikes"; evidence of "disparate questioning"; "side-by-side comparisons" of strikes on prospective jurors; and other types of evidence to support a *Batson* claim). Jameco, in his post-trial motion, stated that the racial makeup of the jury consisted of "eight whites and four African-Americans." Neither party provides any further details in their briefing to this Court. The record does not greatly aid this Court in discerning racial discrimination. *Birkhead v. State*, 57 So. 3d 1223, 1230-31 (Miss. 2011).

¶30. The trial court's determination on Jameco and Jackson's *Batson* challenge was not clearly erroneous. "If the defendant fails to rebut, the trial judge must base his decision on the reasons given by the State." *Berry*, 802 So. 2d at 1037 (citing *Thorson v. State*, 721 So. 2d 590, 593 (Miss. 1998)). If the trial judge has recognized the State's reason as race neutral, and the defendant has presented no evidence of pretext, then the judge's recognition that the reason is race neutral is a sufficient analysis. This Court has stated that so long as the record supports the trial court's ruling, this Court "will not remand the case for that *Batson*-related purpose alone." *Puckett*, 788 So. 2d at 764 (quoting *Gary*, 760 So. 2d at 748); *Corrothers*, 148 So. 3d at 307. This issue is without merit.

¶31. Presiding Justice Kitchens's dissent would have this Court find that the trial court's failure to follow the procedure of Mississippi Rule of Criminal Procedure 18.4(e) was plain error that "impeded the defendants' right to a fair trial by an impartial jury." Diss. Op. (Kitchens, P.J.) ¶ 52. Neither party objected to the procedure utilized by the trial court. Further, there is no evidence that either Jameco or Jackson was prejudiced, and, again,

14

neither Jameco nor Jackson have provided this Court with a complete record as to what occurred during the jury selection procedure. *Branch v. State*, 347 So. 2d 957, 958 (Miss. 1977) ("It is the appellant's duty to see that all matters necessary to his appeal, such as exhibits, witnesses' testimony, and so forth, are included in the record, and he may not complain of his own failure in that regard."). The dissent would have this court sua sponte review the issue for plain error, but, nevertheless, seems to agree that the record poorly evidences what occurred in the jury selection process. The failure to follow procedure is not condoned, and Presiding Justice Kitchens correctly notes that the jury selection process in this case was a departure from this Court's adopted procedure. Even under a plain error analysis, however, this Court cannot manufacture evidence that Jameco and Jackson were prejudiced by the trial court's failure to follow correct procedure. *Id.* ("The Supreme Court may only act on the record presented to it." (citing *Shelton v. Kindred*, 279 So. 2d 642, 644 (Miss. 1973))). Based on the record before this Court, Jameco and Jackson received a fair trial by an impartial jury, and reversal for the trial court's failure to abide by Rule 18.4(e) is not required.

III. **Whether the verdict is against the overwhelming weight of the evidence.**

¶32. When reviewing a challenge to the weight of the evidence, "we weigh the evidence in the light most favorable to the verdict, 'only disturb[ing] a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.'" *Little v. State*, 233 So. 3d 288, 292 (Miss. 2017) (alteration in original) (quoting *Lindsey v. State*, 212 So. 3d 44, 45 (Miss. 2017)). "The jury is the sole

15

judge of the weight and worth of evidence and witness credibility."[9] ***Williams v. State***, 305 So. 3d 1122, 1130 (Miss. 2020) (internal quotation marks omitted) (quoting ***Williams v. State***, 285 So. 3d 156, 160 (Miss. 2019)).

¶33.    Jameco contends that the verdict against him is not supported by the weight of the evidence because Kendarrius's testimony is unreliable and lacks details to make it credible. The State argues that Kendarrius's testimony was clear on relevant points such as his sitting in the backseat with his friend Jameco, the presence of an assault rifle in the backseat and gunfire coming from inside the car. The State avers that Kendarrius's testimony was corroborated by the shell casings found at the scene and the Instagram video.

¶34.    Jackson argues that the evidence does not support the verdict because he is only implicated by the testimony of a "jailhouse snitch."  The State contends that "Kendarrius's testimony was clear that Jackson was driving, announced White's presence, and sped toward White's car."

¶35.    While Jameco and Jackson are correct in their arguments that Kendarrius's testimony was conflicting, this Court is not the judge of witness credibility and does not reweigh the reliability of the testimony. ***Williams***, 305 So. 3d at 1130. Kendarrius was extensively cross-examined on all versions and recantations of his story in the presence of the jury.  While Kendarrius was unclear on details such as how he got in the car, what type of car he was in

---

[9]Jackson's counsel argues that this Court sits as a thirteenth juror in review of his motion for a new trial, which challenges the weight of the evidence. Such a standard of review has been overturned. ***Little***, 233 So. 3d at 292 ("To be clear, when reviewing a motion for a new trial, neither this Court nor the Court of Appeals 'sits as thirteenth juror.'") (citing ***Bush v. State***, 895 So. 2d 836, 844 (Miss. 2005), *overruled by* ***Little***, 233 So. 3d at 292).

16

and what happened after the shooting, these discrepancies were for the jury to weigh and decide. The jury was instructed that Kendarrius was an "admitted accomplice, and as such, the jury should consider his testimony with great caution and suspicion." Officer Clemons testified that he believed Kendarrius because Kendarrius knew details of the crime that had not been released to the public. Kendarrius's testimony was further corroborated by the Instagram video in which he and Jameco claimed to have killed White. "Only slight corroboration of an accomplice's testimony is required to sustain a conviction." *Osborne v. State*, 54 So. 3d 841, 847 (Miss. 2011) (citing *Mangum v. State*, 762 So. 2d 337, 342 (Miss. 2000)). Kendarrius's testimony, when viewed in the light most favorable to the State, supports the jury's verdict. *Id.*

¶36. Jameco, Jackson and the State include in their recounting of the facts different leads in the investigation by Officer Clemons that Officer Clemons determined to be dead ends. Two vehicles that matched the description of the vehicle seen on the surveillance camera footage were discovered by Officer Clemons. Additionally, two guns were found in the possession of different people, in Richland and Adams County, during traffic stops that the Mississippi Crime Lab determined matched the different shell casings found at the crime scene. After investigating, Officer Clemons determined these leads were not helpful in finding the parties responsible for the deaths of the victims.

¶37. Jameco also argues that the evidence in this case is limited due to a failure to properly investigate and follow leads. Jackson argues that the evidence does not support the verdict because no forensic evidence connected him to the crime. Additionally, Jameco and Jackson

17

point out that neither of the guns was found in connection with them.

¶38. Any errors in the investigation were presented to the jury, which determined that Jameco and Jackson were guilty of first-degree murder. Officer Clemons was extensively questioned by counsel for Jameco and Jackson on what they perceived as failures in the investigation. Officer Clemons's reports were presented as exhibits, and Officer Clemons was questioned as to why he left additional information out of his reports. Officer Clemons was further questioned about the guns that were found in Richland and Adams County and his subsequent investigation. This Court has held that "the sufficiency or insufficiency of a police investigation simply goes to the weight of the evidence, and it is for a jury to decide what to believe." *Morris v. State*, 927 So. 2d 744, 748 (Miss. 2006) (citing *Cox v. State*, 849 So. 2d 1257, 1267 (Miss. 2003)).

¶39. The evidence presented at trial supported the verdict. Kendarrius testified to facts that aligned with his initial confession. He told the jury that he had been riding in the car with Jameco, Jackson and Johnson. He testified Jameco had an assault rifle. Jackson, who was driving the car, announced that he saw White and sped towards the car. Kendarrius stated that he had lowered himself into the floor of the car when the shooting began so he did not personally witness Jameco shooting the gun. Jameco, however, was in the backseat next to Kendarrius with an assault rifle, and Kendarrius stated that he heard loud gunfire next to him. Officer Clemons testified that Kendarrius's statements were corroborated by his knowledge that it was a drive-by shooting with different types of guns being fired into the passenger's side of the victim's car.

¶40. Kendarrius also testified that he and Jameco made an Instagram video together after the shooting. The video was played for the jury at trial. When asked what Jameco's statement in the video "hit the blunt seven times like he hit Bleek seven times" meant, Kendarrius explained that it meant that he had killed White. Kendarrius explained that Jameco's statement from the video "smokin on an op" also meant "killed him." The Instagram video further corroborates Kendarrius's testimony.

¶41. The evidence supports the verdict and, considering all inferences in the light most favorable to the verdict, this Court affirms.

**IV.    Whether the evidence is insufficient to support the verdict.**

¶42. In testing the sufficiency of the evidence, this Court reviews the evidence in the light most favorable to the State to determine if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Martin v. State*, 214 So. 3d 217, 222 (Miss. 2017) (internal quotation mark omitted) (quoting *Bush*, 895 So. 2d at 843). Only Jackson raises this argument.

¶43. Jackson was charged with first-degree murder, which required the State to prove beyond a reasonable doubt that Jackson killed a person without authority of law and with deliberate design to cause death. Miss. Code Ann. § 97-3-19(1)(a). The State's theory was accomplice liability, which required the State to prove beyond a reasonable doubt that Jackson was "present, consenting, aiding, and abetting" someone in the commission of the crime. *King v. State*, 47 So. 3d 658, 663 (Miss. 2010) (internal quotation mark omitted) (quoting *Brooks v. State*, 763 So. 2d 859, 861 (Miss. 2000)). Aiding and abetting has been

19

defined by this Court as "the offense committed by those persons who although not the direct perpetrators of a crime, are yet present at its commission, doing some act to render aid to the actual perpetrator." *Id.* (internal quotion marks omitted) (quoting *Smith v. State*, 237 Miss. 498, 115 So. 2d 318, 322 (1959)).

¶44.    Jackson argues that there was no evidence of a plan to shoot White and Justice, there was no motive and there was no proof that he shot a gun.  The evidence showed that Jackson alerted a car full of passengers who were visibly armed that he saw White and proceeded to accelerate towards White's vehicle.  Viewing the evidence in the light most favorable to the State, a rational trier of fact could have found  that Jackson intended for them to fire their weapons at White's car.  Kendarrius's testimony is sufficient to prove that Jackson was "present, consenting, aiding, and abetting" in the commission of the murder.  *King*, 47 So. 3d at 663 (internal quotation mark omitted) (quoting *Brooks*, 763 So. 2d at 861).  This Court affirms.

**V.    Whether the trial court erred by denying Jackson's motion to sever and have separate trials.**

¶45.    The trial court's denial of Jackson's motion for severance is reviewed for abuse of discretion.  *Price v. State*, 336 So. 2d 1311, 1312 (Miss. 1976).  When determining whether to grant a severance the trial judge must consider "(1) whether the testimony of one co-defendant tends to exculpate that defendant at the expense of the other, and (2) whether the balance of the evidence tends to go more to the guilt of one defendant than the other." *Sanders v. State*, 942 So. 2d 156, 159 (Miss. 2006) (citing *Duckworth v. State*, 477 So. 2d 935, 937 (Miss. 1985)).  "The overarching consideration when evaluating these factors is

whether the defendants would be prejudiced by a joint trial." *Id.* (citing *Duckworth*, 477 So. 2d at 937). Only Jackson raises this argument on appeal.

¶46. Jackson filed a pretrial motion to sever his case from Jameco's and argued before the trial judge that the admission of the Instagram video and testimony goes more toward the guilt of Jameco. The State did not oppose the severance. The trial court, however, denied the motion. On appeal, Jackson argues that he was found guilty by association because the bulk of the evidence went to show the guilt of Jameco. The State argues that the inclusion of the Instagram video at trial did not inculpate or exculpate Jackson; he was not mentioned in the video.

¶47. This Court finds that the trial court did not abuse its discretion by denying Jackson's motion to sever. The jury was instructed that "any statements made by Jameco Davis in his Instagram video are not admissible against" Jackson and cannot be considered when rendering a verdict. Jameco and Jackson had similar defenses—they claimed innocence, argued that the police investigation was poorly done and cast doubt on Kendarrius's testimony. The key testimony from Kendarrius did not implicate Jameco over Jackson but showed that they were all in the car Jackson was driving and that Jameco had a gun that he shot at the victim's car. This issue is without merit.

**VI.** **Whether the cumulative errors that occurred at trial denied Jackson his fundamental right to a fair trial.**

¶48. Jackson alone argues that the trial court's cumulative errors—allowing an improper firearm enhancement, denial of his motion to sever and failure to follow proper procedure for a *Batson* challenge—require a reversal of his conviction. "The cumulative error doctrine

21

holds that while harmless error in and of itself is not reversible, where more than one harmless error occurs at the trial level, those errors may have the cumulative effect of depriving a defendant of a fair trial." *Wilson v. State*, 21 So. 3d 572, 591 (Miss. 2009). This issue is without merit because, under Jackson's assignments of error, this Court finds that no error occurred at trial other than the inclusion of the firearm enhancement. While the trial court clearly deviated from the adopted rules on jury selection procedure in criminal cases, the parties were not prejudiced, and this error was harmless. *See* MRCrP 18.4(e). These errors do not require reversal because they did not deprive Jameco and Jackson of a fair trial.

## CONCLUSION

¶49.    This Court vacates the firearm enhancement portions of both Jackson's and Jameco's sentences and affirms the remaining sentences and convictions.

¶50.    **VACATED IN PART; AFFIRMED IN PART.**

**RANDOLPH, C.J., COLEMAN, MAXWELL, BEAM AND GRIFFIS, JJ., CONCUR. KITCHENS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J., AND ISHEE, J. KING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J., AND ISHEE, J.**

**KITCHENS, PRESIDING JUSTICE, DISSENTING:**

¶51.    I agree with Presiding Justice King that "the State's failure to provide a race-neutral reason for using a peremptory strike against Rosie and, further, the lack of record support or voir dire for the State's guess as to its reason for using a peremptory strike against Rosie require reversal." Diss. Op. (King, P.J.) ¶ 74. In addition to the *Batson*[10] violation, I find that the trial court erred by its noncompliance with Mississippi Rule of Criminal Procedure

---

[10] *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

18.4(e).

¶52. "Under the plain-error doctrine, we can recognize obvious error which was not properly raised by the defendant on appeal, and which affects a defendant's 'fundamental, substantive right.'" *Smith v. State*, 986 So. 2d 290, 294 (Miss. 2008) (quoting *Debrow v. State*, 972 So. 2d 550, 553 (Miss. 2007)). "Plain-error review is properly utilized for 'correcting obvious instances of injustice or misapplied law.'" *Id.* (quoting *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 256, 101 S. Ct. 2748, 69 L. Ed. 2d 616 (1981)). The trial court's failure to comply with Rule 18.4(e) impeded the defendants' right to a fair trial by an impartial jury. *See Johnson v. State*, 476 So. 2d 1195, 1209 (Miss. 1985) ("The right to a fair trial by an impartial jury is fundamental and essential to our form of government. It is a right guaranteed by both the federal and the state constitutions." (citing *Adams v. State*, 220 Miss. 812, 72 So. 2d 211 (1954))). Also, the defendants' *Batson* review was impaired by the trial court's lack of adherence to prescribed and well-established jury selection procedures, which contributed mightily to gaping and confusing deficiencies in the record.

¶53. By unanimous order, on December 13, 2016, this Court adopted the Mississippi Rules of Criminal Procedure. That order mandated that those rules "shall govern the procedure in all criminal proceedings in the Circuit, County, Justice and Municipal Courts of this State. These rules shall take effect on July 1, 2017." Order, *In Re: Adoption of Miss. Rules of Crim. Proc.*, No. 89-R-99038-SCT (Miss. Dec. 15, 2016). The Court in its order said that the purpose of this singular set of criminal procedural rules was "to promote justice, uniformity, and efficiency in our courts[.]" *Id.*

¶54.     These rules were in full force and effect when the present case was being litigated in the Circuit Court of Adams County, and they "govern[ed] the procedure" in this case. *Id.* Among those rules is Rule 18.4, entitled "Procedure for Selecting a Jury." Rule 18.4(e) of the Mississippi Rules of Criminal Procedure is as follows:

> **(e)**     **Exercise of Peremptory Challenges.** Following examination of the jurors, the parties shall exercise their peremptory challenges, in the order in which the jurors have been seated, as follows:
>
> >    (1)     the court shall rule upon all challenges for cause before the parties are required to exercise peremptory challenges;
> >
> >    (2)     next, the prosecuting attorney shall tender a full panel of accepted jurors to the defendant(s), after having exercised any peremptory challenges desired;
> >
> >    (3)     next, the defendant(s) shall go down the juror list accepted by the prosecuting attorney and exercise any peremptory challenges to that panel;
> >
> >    (4)     once the defendant(s) exercise peremptory challenges to the panel tendered, the prosecuting attorney shall then be required to tender sufficient additional jurors to constitute a full panel of accepted jurors;
> >
> >    (5)     the above procedure shall be repeated until a full panel of jurors has been accepted by all parties; and
> >
> >    (6)     once the jury panel is selected, alternate jurors shall be selected following the procedure set forth above for selecting the jury panel.
>
> Constitutional challenges of the use of peremptory challenges shall be made at the time each panel is tendered. Peremptory challenges shall be made out of the hearing of the jurors, but shall be of record.

MRCrP 18.4(e). This mandatory procedure pertaining to challenges for cause and peremptory

24

challenges was not followed by the trial court.

¶55.    Rule 18.4(e)(1) requires that "the court shall rule upon all challenges for cause before the parties are required to exercise peremptory challenges[.]" MRCrP 18.4(e)(1). Rather than disposing of all for-cause challenges before moving to peremptory challenges, the trial court combined the process of making challenges for cause with the exercise of peremptory challenges. For example, regarding prospective juror Breanna Cameron, the record reveals the following:

> (After the State tendering a panel of six and asking for Breanna Cameron to be struck for cause, the following was made of record, to-wit:)
>
> BY THE COURT:   What's your basis for cause?
>
> BY MS. BLUNTSON:[11]   Your Honor, Ms. Cameron indicated that she would not be able to look at the pictures and that she was—she did not like guns. She did not indicate that she could be fair and impartial to my knowledge, but she did indicate that she would not be able to look at the pictures if she were selected, and thus an important part of the case as well.
>
> BY THE COURT:   Mr. Jex.[12]
>
> BY MR. JEX:   Your Honor, when I spoke directly to Ms. Cameron during my voir dire, I successfully rehabilitated her. I asked her about not being able to view the pictures and if you'll remember I got her to separate that from being uncomfortable and following the law. She said she could be fair. She would follow the law. I don't think she's a strike for cause.

---

[11]Barbara Ann Bluntson, Assistant District Attorney

[12]Zach Jex, defense attorney for Jacqlaurence Jackson

25

BY THE COURT: Yes. She was clear that she could be fair after Mr. Jex questioned her. So the Court will not allow Ms. Cameron to be struck for cause.

BY MS. BLUNTSON: We'd like to use S-5 against Ms. Cameron.

BY THE COURT: That will be S-5.

¶56. This back-and-forth, alternating procedure with for-cause and peremptory challenges was repeated numerous times during the jury selection process. An attorney would voice a for-cause challenge, the court would not allow a strike for cause, but then the court would permit the attorney to exercise a peremptory strike on that prospective juror. This method of selecting and de-selecting jurors is entirely contrary to the mandate of Rule 18.4(e)(1) that *all* of the parties' challenges for cause shall have been ruled upon in advance of the exercise of peremptory challenges. This irregularity is but one among several.

¶57. In promulgating the Mississippi Rules of Criminal Procedure, this Court understood the importance of a trial court's dispensing with for-cause challenges before moving to peremptory challenges. In its creation of these rules, the Court did not arbitrarily decide to require that for-cause challenges, and rulings thereon, be completed before peremptory challenges are considered. The sequential process for the exercise of for-cause and peremptory strikes, meticulously described in Rule 18.4(e) of the Mississippi Rules of Criminal Procedure, had been in use in the state courts of Mississippi for decades before they were adopted formally by this Court. Before the present criminal procedure rules became effective on July 1, 2017, the same jury selection process was described in former Rules 4.05 and 10.01 of our state's Uniform Rules of Circuit and County Court Practice. *See* URCCC

4.05; *see also* URCCC 10.01.

¶58.     The step-by-step order in which the venire is seated is of paramount importance in the jury selection process. An attorney who is about to be engaged in the exercise of peremptory challenges on behalf of a client, regardless of whether the attorney is a prosecutor or defense counsel, cannot undertake that task intelligently without knowing which venire members have been excused for cause. Occasionally, no challenges for cause are granted by the trial judge. Sometimes none is requested. Often, however, many challenges for cause are granted. When that has happened, even if the number is small, the venire list changes. A trial attorney must be able to look at that list from beginning to end and decide how he or she will use the allotted number of peremptory challenges. In some instances, an attorney may look at the pared-down list and see that the potential juror he most fears is near the end of the list, or, perhaps, the very last person on the list. The attorney knows that he or she must save a peremptory challenge for that venire member. That would be infinitely more difficult, and sometimes impossible, if those who have succumbed to a for-cause challenge are still in the mix.

¶59.     There is no limitation on the number of potential jurors who can be excused for cause. *See* MRCrP 18.3(b). However, there are numerical limitations on the number of peremptory challenges that can be exercised. MRCrP 18.3(c). It would be foolhardy for an attorney to undertake the highly important task of exercising peremptory strikes without carefully planning those strikes in terms of which venire members he or she deems the least favorable to his client, whether the lawyer is a prosecutor or a defense attorney. An attorney looking

at a list—often a lengthy list—of venire members from whom he or she must de-select a finite number of persons must rank them in terms of which ones he or she *least* wants on the jury. This is a heavy and vitally important responsibility. It is an exercise that cannot be undertaken competently when numerous persons who may be excused for cause remain on the list. This is one of the compelling reasons for completing challenges for cause before embarking on peremptory challenges.

¶60.    Another serious irregularity is that the record is insufficient.  Omissions from the transcript are obvious. The criminal rules mandate that both for-cause challenges and peremptory challenges be made on the record. *See* MRCrP 18.3(b); *see also* MRCrP 18.4(e). But the first mention in the record of a State's for-cause challenge or a peremptory challenge did not appear until prospective juror Breanna Cameron, who became the State's peremptory challenge S-5, was under consideration. Thus, S-5 marks the first reference to any peremptory challenge that appears in the record. The transcript does not contain the State's first four peremptory challenges. Nor does it contain the eighth through tenth peremptory challenges exercised by the State. The transcript contains an incomplete account of the State's exercise of its challenges, and there is a complete absence of information regarding the defendants' exercise of their challenges. These deficiencies raise inescapable doubts with respect to the integrity and veracity of the transcript. Whether this part of the jury selection process was not transcribed inadvertently, or whether it was not taken down in the first place, cannot be determined. Whatever the case, the criminal rules require that both for-cause and peremptory challenges be recorded.

¶61. Rule 18.4(e)(2) of the Mississippi Rules of Criminal Procedure (emphasis added) requires: "*next*, the prosecuting attorney shall tender a full panel of accepted jurors to the defendant(s), after having exercised any peremptory challenges desired[.]" The word *next* connotes the step that must occur after the trial judge has ruled on all challenges for cause. It presupposes that this has occurred. Although it is conceivable that some extraordinary circumstance could arise that would necessitate the court's consideration of an additional challenge for cause, or even a *sua sponte* dismissal of a juror for cause,[13] ordinarily there would be no more for-cause challenges after the judge had ruled on all of the challenges of that kind, whether made by prosecution or defense.

¶62. The rules requirement that the State tender a full panel to the defendant was derived from a Mississippi statute. *See* Miss. Code Ann. § 99-17-3 (Rev. 2020). Code Section 99-17-3 states that "[i]n all cases the accused shall have presented to him a full panel before being called upon to make his peremptory challenges." Miss. Code Ann. § 99-17-3. In *Gammons v. State*, this Court interpreted an earlier iteration of the statute, which contained identical language. *Gammons v. State*, 85 Miss. 103, 37 So. 609, 610 (1905). This Court held that

> this statute has been construed to mean that the defendant is not only entitled to have a full panel tendered him, in the first instance, before being required to exercise any of his peremptory challenges, but, after he has challenged all those on the panel first presented whom he may desire, he is entitled to again have a full panel tendered, and this course repeated until the jury is finally secured.

*Id.* The Court also recognized that

_____

[13]MRCrP 18.3(b).

> The better practice to be pursued in impaneling juries in capital cases, or other cases exciting great public interest—and this we commend—is that the presiding judge shall personally conduct the entire examination in ascertaining the competency of each juror as presented, allowing full latitude to counsel in their suggestions of questions to be propounded, and giving free scope to such preliminary investigation, so as to fully search the conscience of the juror, and then *pass on all challenges for cause* before the juror is by the court pronounced qualified and allowed to take a seat in the jury box. *When the panel is complete of jurors so found to be qualified, present to the state for the exercise of peremptory challenges*; when a *full panel* is accepted by the state, *present to the defendant*, and call on him to make *his peremptory challenges*; and so repeat, as hereinbefore indicated, until the challenges are exhausted, or both sides announce themselves content with the jury. In actual practice this rule will be found to insure a full and impartial examination of every juror without unnecessary prolixity or repetition, will prevent much confusion, and will materially expedite the impaneling of juries in cases of great notoriety.

*Id.* (emphasis added). Key parts of this *better practice* have been adopted by the Court in its criminal rules. The rules contemplate that, once the for-cause challenges are out of the way, two things remain to be done in the jury selection process:  the exercise of peremptory challenges, and the selection of alternates. *See* MRCrP 18.4(e)(1)-(2). The criminal rules direct that the State tender to the defendant(s) a *full panel* of the prospective jurors it has accepted. This means that the State would have exercised whatever number of its allotted peremptory challenges[14] it wanted to strike, peremptorily, from the first twelve venire members. For instance, if the State struck two persons from the first twelve, then the court would tender the next two venire members to the State. If the prosecutor struck one of those, the court would tender to the State the next person on the list. If the State accepted that one,

---

[14]In this murder case, each side was entitled to twelve peremptory challenges in the selection of the twelve-person jury, then two more to each side for the selection of two alternate jurors. MRCrP 18.3(c)(1)(A)(i)-(c)(1)(B)(ii). Because this was a joint trial, each side was entitled to two more peremptory challenges. MRCrP 18.3(c)(2). Of course, neither side was required to use all of its available peremptory challenges unless it chose to do so.

30

then the prosecutor would tender to the defense the twelve he or she had accepted.

¶63. Immediately prior to the exchange, quoted above, concerning Breanna Cameron, the record shows the following:

> BY THE COURT: So, what will happen, Ms. Bluntson, is the State, will tender a panel of twelve to the defense.

The judge would have been right if the challenges for cause had been completed and the court was about to embark upon peremptory challenges. But at that point, the State already had exercised four peremptory challenges.[15] What can be discerned from the record is that the State *never* tendered a full panel of twelve venire persons to the defense. When the judge explained to the assistant district attorney, "So what will happen, Ms. Bluntson, is the State will tender a panel of twelve to the defense[,]" the very next thing that appears in the transcript is an entry in parentheses, likely made by the court reporter,[16] that the State tendered a panel of *six*, not twelve.

¶64. The record does not inform us what occurred concerning the State's first four peremptory strikes, or how many jurors had been accepted when Ms. Cameron was tendered to the State; the record is altogether devoid of any definitive information in that regard. What is abundantly clear is that the State did not tender to the defense a full panel of twelve venire members.

---

[15]That part of the jury selection process—the State's exercise of its first four peremptory challenges—is completely absent from the record before us.

[16]Pursuant to the Mississippi Rules of Criminal Procedure, "[i]n all felony cases, the court reporter shall make a record of the *voir dire* and selection of the jury, . . . whether or not such is ordered by the judge or requested by either party." MRCrP 20(a).

¶65. Due to unusual and unexplained omissions from the record, this Court is left with no inkling of any of the circumstances surrounding the State's first four peremptory challenges, whether the State had sought to challenge those persons for cause, whether *Batson* questions arose during that unrecorded process, if there ever was a time when the State had tendered twelve veniremen to the defense, or what objections or other input, if any, defense counsel provided during that undocumented interval in one of the most critical parts of the trial.

¶66. The trial court's failure to abide by Rule 18.4 of the Mississippi Rules of Criminal Procedure requires reversal as this Court has recognized that "[a] rule which is not enforced is no rule." *Box v. State*, 437 So. 2d 19, 21 (Miss. 1983); *see also Fulks v. State*, 18 So. 3d 803, 805 (Miss. 2009). I find that the trial court's violation of Rule 18.4 in conjunction with the State's *Batson* violation requires reversal of Jameco Davis's and Jacqlaurence Jackson's convictions. Thus, I would reverse and remand for a new trial or *trials*, in the event a severance is requested and granted.

**KING, P.J., AND ISHEE, J., JOIN THIS OPINION.**

**KING, PRESIDING JUSTICE, DISSENTING:**

¶67. Because I would find that the State failed to provide a race-neutral reason for its strike of a potential juror, I respectfully dissent. Accordingly, I would reverse Jameco Davis's and Jacqlaurence Jackson's convictions and remand this case for a new trial.

¶68. The procedure employed when addressing a challenge under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), is well-established:

> (1) the defendant must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose; (2)

32

once the defendant has made out a prima facie case, the burden shifts to the State to explain adequately the racial exclusion by offering permissible, race-neutral justifications for the strikes; and (3) if a race-neutral explanation is tendered, the trial court must then decide whether the opponent of the strike has proved purposeful racial discrimination.

*Pruitt v. State*, 986 So. 2d 940, 942-43 (Miss. 2008) (citing *Johnson v. California*, 545 U.S. 162, 168, 125 S. Ct. 2410, 2416, L. Ed. 2d 129, 138 (2005)). Following the State's request to use a peremptory strike on Juror 39, Rosie Jackson, the defense raised a *Batson* challenge. The trial court asked the State to provide its race-neutral reason for the strike. The following transaction resulted:

> THE STATE: I had the reason written down, Your Honor. I believe if I'm not mistaken, we may have some information on Ms. Jackson regarding family members being involved in some criminal matters concerning—I think the family member of the [sic] one of the victims involved in a crime. I am not sure. We were speaking with our—I am sorry.
>
> THE COURT: That's okay.
>
> THE STATE: I don't have it written down, Your Honor.
>
> THE COURT: But what is it as you recall? Is it information from your office or from—
>
> THE STATE: From one of the investigators, detectives providing information on the juror, and we thought that it was information worthy of a strike. I didn't record it.
>
> THE COURT: All right.
>
> THE STATE: But certainly not because she's African American. I know that we have to show a race neutral reason.

¶69. The trial court then asked the defense for its response, and defense counsel stated that he did not have any notes regarding Rosie's responses during voir dire. Defense counsel also

requested to be given the information that the State had received from its investigator. The State responded: "That's the thing. We were just conversing, and when selecting our persons and determining our strikes, I didn't record it, but it was definitively brought up in our conversations. Everybody we spoke with is still across the hall." Defense counsel again pointed out that Rosie had not responded to any questions during voir dire. The trial court next prompted the State and asked if the peremptory strike was because of the victim's family. The State responded:

> Right. It was a member of the victim's family if I am not mistaken that may have been involved—in one of the victims of Mr. White's family member may have been involved in criminal activity involving this individual which she did not speak on that during voir dire, but I am not certain.

The trial court found that the State had provided a race-neutral reason and allowed the peremptory strike.

¶70. I would find that the trial court erred by allowing the State to use a peremptory strike against Rosie. Step two of the *Batson* analysis requires the State to adequately explain its exclusion by offering justifications for the peremptory strike. *Pruitt*, 986 So. 2d at 943-44. I find the State's attempt to offer a race-neutral reason for striking Rosie more than troubling. When asked for its justification for the strike, the State repeatedly stated that it was not sure but that a detective or investigator had provided information that was worthy of a strike. The State did not record the information and could not specifically recall what the information had been. Although it stated that it may have been that a member of a victim's family had been involved in criminal activity with Rosie or her family, the State repeatedly stated that it was not certain. The State also failed to state *who* in particular it had spoken to that had

34

provided any information. Therefore, I find that the State's attempt to provide the trial court with a race-neutral reason for the strike was more akin to an attempt to convince the court that there was a reason for the strike.

¶71. Further, even taking the State's uncertainty as a sufficient reason to proceed to step three of the ***Batson*** analysis, this Court previously has held that "[l]ack of support in the record for the reason given for a peremptory strike has been identified as an indicator of pretext." ***Flowers v. State***, 947 So. 2d 910, 924 (Miss. 2007) (citing ***Manning v. State***, 765 So. 2d 516, 519 (Miss. 2000)). As the defense pointed out in rebuttal, the record in this case undisputedly contains no support for the State's proffered reason for striking Rosie.

¶72. This Court also has held that an indication of pretext is "the failure to voir dire as to the characteristic cited . . . ." ***Pruitt***, 986 So. 2d at 944 (quoting ***Lynch v. State***, 877 So. 2d 1254, 1272 (Miss. 2004)). Here, the defense additionally pointed out on rebuttal that Rosie had not responded to any questions in voir dire. The State also chose not to question Rosie during voir dire as to its vague suspicions regarding whether a member of her family "may have" been involved in criminal activity with a family member of one of the victims. In fact, the State asked no questions in voir dire regarding any relation to either victim or their family members. And when the trial court asked the venire whether anyone knew either victim or their family, there was no response from the venire.

¶73. The majority cites ***Pruitt*** and states that "this Court has allowed prosecutors to use information supplied by a third-party as a race neutral reason to strike potential jurors." Maj. Op. ¶ 23 (citing ***Pruitt***, 986 So. 2d at 945). Yet in ***Pruitt***, the State clearly explained that law

enforcement officers had provided information about the potential jurors and proceeded to inform the court exactly what that information had been. *Pruitt*, 986 So. 2d at 944. Here, however, the State failed to state specifically who had provided information to it and also was unsure what that information had been.

¶74.    "A 'defendant [has] the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria.'" *McGee v. State*, 953 So. 2d 211, 215 (Miss. 2007) (alteration in original) (quoting *J.E.B. v. Alabama*, 511 U.S. 127, 129, 114 S. Ct. 1419, 128 L. Ed. 89 (1994)). As this Court has stated, "[o]nly one instance . . . of purposeful discrimination is enough to prove a discriminatory purpose." *H.A.S. Elec. Contractors, Inc. v. Hemphill Constr. Co.*, 232 So. 3d 117, 124 (Miss. 2016) (internal quotation marks omitted) (quoting *McGee*, 953 So. 2d at 215). I would find that the State's failure to provide a race-neutral reason for using a peremptory strike against Rosie and, further, the lack of record support or voir dire for the State's guess as to its reason for using a peremptory strike against Rosie require reversal. Accordingly, I would reverse Davis's and Jackson's convictions and would remand this case for a new trial.

    **KITCHENS, P.J., AND ISHEE, J., JOIN THIS OPINION.**